L.K.F v M.T.F (2024 NY Slip Op 50369(U))

[*1]

L.K.F v M.T.F

2024 NY Slip Op 50369(U)

Decided on April 4, 2024

Supreme Court, Nassau County

Dane, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on April 4, 2024
Supreme Court, Nassau County

L.K.F, Plaintiff,

against
M.T.F, Defendant.

Index No. XXXXXX/2021

Attorney for Plaintiff:
Firm Name: MULHERN & KLEIN
Address: 3366 Park Avenue Suite 200, Wantagh, NY 11793
Phone: (516) 783-0380
Service E-mail: 
jklein@mulhern-klein.com
Attorney for Defendant:
Firm Name: GASSMAN BAIAMONTE GRUNER, P.C.
Address: 666 Old Country Rd, Ste 801, Garden City, NY 11530
Phone: (516) 228-9181 
Service E-mail: bchou@gbgmatlaw.com

Edmund M. Dane, J.

PRELIMINARY STATEMENT
The Plaintiff moved by Order to Show Cause dated October 26, 2022 [FN1]
seeking an Order: (1) That plaintiff's interest in XXXX LLC is and be declared to be her separate property; (2) That defendant has no claim to the appreciation of plaintiff's separate property, inasmuch as plaintiff has made no contribution towards it.
The Defendant cross-moved by Notice of Cross-Motion dated November 22, 2022 [FN2]
seeking an Order: (1) That Plaintiff's interest in the XXXX, LLC is and be declared marital property for purposes of this action; or, in the alternative (2) That Defendant has a valid claim of marital appreciation of the value of Plaintiff's interest in XXXX, LLC; and (3) Directing an appraisal of the Plaintiff's interest in XXXX, LLC to ascertain the value of said interest and/or [*2]the appreciation in value of said interest during the parties' marriage, as the case may be; (4) Denying all of the relief requested in the Plaintiff's Order to Show Cause; and (5) Such other and further relief as may appear just and proper to this Court. 

BACKGROUND
Most of the procedural background of this case is more fully recited and set forth in this Court's Decision and Order dated February 7, 2023, L.F. v. M.F., 78 Misc 3d 810 (Supreme Court Nassau County 2023) (hereinafter referred to as the "February 2023 Order"). In short summary, Branches (1) and (2) of the Plaintiff's Order to Show Cause dated October 26, 2022 (see supra), and Branches (1), (2) and (4) of the Defendant's Notice of Cross-Motion dated November 22, 2022 (see supra) were referred to a hearing. This matter proceeded to a five (5) day plenary hearing, commencing on April 27, 2023, which continued thereafter on May 8, 2023, May 30, 2023, June 20, 2023 and July 18, 2023 (hereinafter collectively referred to as the "Hearing"). Written post-hearing Memorandum(s) of Law were submitted by the parties on September 11, 2023. The Defendant was granted permission by this Court to submit a Supplemental Memorandum of Law on October 18, 2023 (hereinafter referred to as the "Husband's Supplemental Memorandum") and the Plaintiff was granted permission by this Court to submit a responsive Supplemental Memorandum of Law on November 22, 2023 (hereinafter referred to as the "Wife's Supplemental Memorandum").

THE HEARING TESTIMONY
The sum and substance of the testimony of the parties is summarized as follows and all as more fully set forth herein. The Plaintiff will hereinafter be referred to as the "Wife" and the Defendant will hereinafter be referred to as the "Husband".[FN3]

A. Wife's Case:
1. Testimony of R.O.
Direct Examination
R.O. (hereinafter referred to as "Mr. O") is the Wife's father. He testified as to background and familial information. He has two other children - siblings of the Wife - A and B Mr. O graduated from St. John's University School of Law, holds a law license, and also holds a Master's Degree in Taxation which he received from New York University. Mr. O is employed by "RRR" (hereinafter referred to as "R") as Executive Vice President. He has been employed with R since 2005. Mr. O was previously a tax Partner with P.H. from 2000 to 2005.
Mr. O testified about the formation of XXXX, LLC (hereinafter referred to as "XXXX"), which is a Delaware Limited Liability Company. XXXX was formed in 2015. Mr. O's initials are [*3]"XXXX". The Certificate of Formation of XXXX [FN4]
was filed on February 26, 2015. Mr. O formed XXXX in Delaware, as the State is "user friendly". The LLC Agreement of XXXX dated March 1, 2015 [FN5]
(hereinafter referred to as the "LLC Agreement") reflects a registered office in Delaware. The Principal Office is listed as "R".
Mr. O described why XXXX was formed and XXXX's "structure". In 2015, he had a tumor in his esophagus. That tumor could have been fatal. Mr. O wanted to form an LLC to hold certain investments and to facilitate estate planning. XXXX is comprised of five (5) people: Mr. O, Mr. O's wife, and his three (3) children. His three (3) children each hold a thirty (30%) percent interest. Mr. O holds a five (5%) percent interest. Mr. O's wife holds a five (5%) percent interest.
Mr. O testified about XXXX's initial capitalization and the execution of the LLC Agreement. The total initial capitalization was $10,004.00.[FN6]
Mr. O provided $10,000.00. The other $4.00 capitalization was allocated $1.00 to each of the other members of XXXX. However, the $1.00 from each of the other four members was never actually contributed. The Wife accepted her thirty (30%) percent interest in XXXX by signing the LLC Agreement.
Mr. O testified about the absence of any gift tax returns. No gift tax returns were filed in 2015 for the Wife's gift in XXXX as there was no need to file a gift tax return. No gift tax return were ever filed in the future.
Mr. O testified about the value of XXXX and, in effect, how XXXX is operated. The value of XXXX from its inception has grown "quite a bit". XXXX owns interests in investments in businesses due to Mr. O's participation in XXXX. Mr. O selects the investments for XXXX based upon his work with R. Any companies that XXXX invested in were selected by Mr. O, without involvement from his spouse, the Wife or the Wife's siblings. The cost of the investment in the companies reflect zero. XXXX received interest(s) in such companies because Mr. O received the interest(s) through his work with R. Mr. O then gave the interest(s) to XXXX. Mr. O never sought the opinions of the other members of XXXX and they did not volunteer any opinions relating to these investments. The consent of the other members of XXXX was never sought, nor did Mr. O notify the other Members of XXXX of these purchases; this is because he is the sole decision-maker. While the LLC Agreement of XXXX provides that XXXX is managed by its Members, Mr. O nonetheless makes all of the decisions relating to XXXX. The Wife provides no managerial services for XXXX. While the other members of XXXX have the full right to operate, manage, control and make decisions, the Wife provides no operational services for XXXX. Mr. O testified that the Wife has not made any contribution towards XXXX. Mr. O testified that the Husband has made no contribution towards XXXX.
Mr. O prepared and testified about a summary chart.[FN7]
The cost of investment column shows mostly "zero's". The source of capital to acquire was from Mr. O, or returns from other investments generated by XXXX's prior investments.
Mr. O testified regarding certain "zoom" meetings he had with the members of his family. At his examination before trial, Mr. O testified these "zoom" meetings, which generally began in 2020, at the onset of the COVID-19 global health pandemic. Those meetings generally continued once per month thereafter. Mr. O and his spouse were not seeing the Wife and their other two (2) children, so he suggested a "zoom" meeting to get together as a family (albeit virtually) and to address tax information which his children needed information about. Mr. O taught a tax course at Columbia graduate school. He discussed this on the "zoom" calls with his family. In sum, Mr. O would discuss how taxes "work" using his notes, then how the stock market works, how inflation works and the concept of interest rates. XXXX was discussed at one of these "zoom" meetings to give the family a sense of the investments. He additionally explained how partnership tax works. Generally speaking, on these zoom meetings, the family would spend time talking, then Mr. O would lecture for approximately thirty (30) to forty (40) minutes, and then he answered any questions. Prior to the family meetings, Mr. O felt as if the Wife had little or no knowledge of XXXX's operations. After these meetings, he felt as if the Wife knew more about tax ramifications.
Mr. O testified about XXXX and taxes. XXXX receives K-1 statements from companies that it invests in. Then, Mr. O prepares tax returns. After XXXX invests in a company, XXXX plays no role, other than making the investment. XXXX also has no board of directors. Schedule K-1's are issued to XXXX's members. Six (6) years of K-1 statements were issued to the Wife [FN8]
which reflect varying percentages in ownership: 30% in 2015, 30% in 2016, 10% in 2017, 20% in 2018, 15% in 2019 and 15% in 2020. Mr. O prepared the Schedule K-1's. Mr. O explained that the differences in the six (6) years of Schedule K-1 statements were because of taxable income of XXXX and the distributions to its members.
Cross-Examination
Mr. O acknowledged that XXXX has grown "quite a bit" since its inception. Mr. O also acknowledged that the initial capital contribution of $10,000.00 was not a gift. The $10,000.00 at formation is worth at least $15,000,000.00 or more today. Mr. O performed valuations in 2022. While XXXX keeps Schedule K-1 statements, it does not keep journals. XXXX does not invest in any "controlling interest", other than one (1) investment.
The LLC Agreement was drafted by a paralegal at the direction of Mr. O. Mr. O thought this was the appropriate vehicle for his family due to his health issues and that there were tax benefits. The appreciation is for his children, which is why it is not included in his estate. This vehicle minimized his capital gains if an asset was sold during his lifetime. There are also estate tax advantages with respect to the appreciation. Mr. O saved money for himself and his estate using the LLC Agreement. Third parties manage some of the investments of XXXX. The investments are all passive investments.
After the $10,000.00 capital contribution, the LLC Agreement provides that additional contributions of cash or property can be made by the Members. However, only Mr. O made additional contributions. Mr. O provided how the distributions would be made and the "pecking order" of the distributions. There is an approximate seven (7%) percent return on his capital contribution. After year 2015, there were lower interest rates, so a seven (7%) percent return was [*4]a "good" return, one that was more than a fixed income. After the seven (7%) percent return, Mr. O, he would received the return of his capital. Thereafter, and if anything was left, what was left would be disbursed to the members of XXXX by percentage. Regarding losses, such losses are allocated to the Members. Today, all Members have capital accounts. The capital accounts are positive. Any losses are allocated by percentage. Profits are allocated to offset losses, if any. The officers of XXXX are the same as the five (5) Members of XXXX. The LLC Agreement provides that they are responsible for the day-to-day operations, but no Member is required to make capital contributions.
The Schedule K-1's to the Wife reflect that she received $49,874 in ordinary business income in 2016, $20,854 in ordinary business income plus $17,000 in distributions in 2017, $27,707 in ordinary business income in 2018, $117,855 in ordinary business income in 2019 and $141,359 in ordinary business income plus $36,262 in interest and dividend income in 2020.
Mr. O started family meetings in 2020 which occurred as late as 2022. Logistically, his assistant would put the meeting on the calendar. The "standard" meeting date was usually held on Tuesdays. Mr. O was not sure who would send out the zoom invites, suspecting that it may have been his other daughter, Erin. At one of these sessions, he may have provided his family with "projections". There were a total of approximately ten (10) to twelve (12) family meetings on zoom. Anywhere from thirty (30) to forty (40) minutes would be devoted to tax and financial matters. During these family meetings, XXXX was mentioned maybe twice.
XXXX's Investment Summary [FN9]
is a spreadsheet that was prepared by Mr. O at the end of year 2020. It was provided to the members of XXXX during a "zoom" call, and he told the Members what it was designed to show, for example, investments, future cash-flow projections and value. He covered the issue of tax implications on a prior zoom call with the family. Mr. O provided those on the zoom call with a list of professionals: two to three attorneys, accountants and some contacts at some companies. Mr. O would also explain the nature of the investments.
XXXX is the only investment that Mr. O holds with his family. It is a valuable company. Mr. O did not discuss the substance of each investment with his family. Yet, Mr. O conceded that he allowed his family members to act if he was seriously ill. Mr. O felt it was important for his family to have basic information on XXXX and whom to call if he died. Mr. O discussed the tax reporting obligations of XXXX with his family. XXXX is a "pass through" entity.
Re-Direct Examination
Mr. O testified about his initial $10,000.00 capital contribution. The $10,000 capital contribution was not a gift because he had retained right to return of that $10,000.00. It was not a gift to anyone.
Mr. O testified regarding the granting of authority to others. He gave authority to the other officers if anything happened to him; but, to date, there is no reason for anyone else to exercise any rights.
Mr. O again testified as to who, in effect, manages XXXX. Mr. O exercises sole control of XXXX, and only Mr. O runs XXXX.
Re-Cross Examination
Mr. O reiterated against that the initial $10,000.00 capital contribution was not a gift.
[*5]2. Testimony of the Wife
Direct Examination
The Wife testified as to some background information. The Wife and the Husband were married on August 24, 2013. They have three (3) children together, Amelia, who is eight (8) years old, Susan, who is six (6) years old, and Mathilda, who is three (3) years old. The Wife graduated from Manhattan College in 2007 with a Bachelor's degree in Sociology, and from New York University with a Master's degree in Urban Planning. After graduating from college, the Wife worked up and to the year 2019. At that time, she was earning anywhere from $40,000.00 per year to $60,000.00 per year. In 2019, the Wife and the Husband agreed that she would stay home with the three (3) children, so the Wife stopped working.
The Wife testified surrounding, in effect, acquiring her interest in XXXX. She has a thirty (30%) percent interest in XXXX from her father. The Wife paid no money for her thirty (30%) percent interest. She first became aware of XXXX in March of 2015. Her father provided her with the LLC Agreement in her home during a regular family visit. She was unaware of the LLC Agreement before this encounter. The Wife had no conversations with Mr. O before she saw the LLC Agreement in March of 2015. The Wife could not recall if she even read the LLC Agreement prior to signing it. She did not ask Mr. O questions before signing it because Mr. O always "looks out for her", and she felt as if she did not have the right to "question" him. After the Wife signed the LLC Agreement she gave it back to Mr. O and she told the Husband about it after she signed it.
The Wife testified about certain emails. She received one from the Husband in 2017 [FN10]
wherein the Husband wrote to her, in sum and substance, that they needed $5,000,000.00 to retire, but that the Wife already had this in her "inheritance" from her parents. The Husband characterized the Wife's interest in XXXX as the Wife's "inheritance". In addition to the Wife's interest in XXXX, the parties have a house, a 401(k), bank accounts, but nothing "substantial". The Wife testified about another email she received from the Husband on January 13, 2020,[FN11]
wherein the Husband wrote to the Wife, in sum and substance, that she receives "passive income". The Wife testified about another email she received from the Husband on September 10, 2018 [FN12]
wherein the Husband wrote to her regarding, in sum and substance, her inheritance.
The Wife testified about XXXX's LLC Agreement. It provides that the Members of XXXX were to contribute $10,004.00 of cash to the capital, i.e., that the Wife would contribute $1.00 for her 30% interest. However, the Wife did not actually contribute the $1.00. Other than the $1.00 referenced in the LLC Agreement, the Wife contributed no other money to XXXX and has not contributed to XXXX. While the LLC Agreement provides that the Members have the sole power to control operations, etc., the Wife has not contributed, at all, to the operation, control of affairs, and/or the managing of XXXX. The Wife testified that she has made no decisions regarding XXXX.
The Wife testified regarding tax documents and money from XXXX. After she signed the LLC Agreement, she receives a Schedule K-1 annually, and an income check annually. There are no other writings. The only oral communications about XXXX is when Mr. O mentioned it in family meetings. She receives a different amount of money annually, and Mr. O decides the distributions. Before she receives a check, there are no discussions with Mr. O regarding annual distributions. From years 2016 through 2019, she gave the Husband her Schedule K-1 statements because he prepared their joint tax returns. The Husband felt no need for an accountant. Other than providing the Husband with her W-2's, 1099's and Schedule K-1 forms, she has no other involvements with the parties' tax returns.
The Wife testified about portions of the parties' jointly filed income tax returns. She first testified about the 2016 return, more specifically, Schedule E.[FN13]
On same, it reflects $49,874 in passive income from her Schedule K-1 from XXXX and that there is no income reflected thereon classified as non-passive. Next, regarding the 2017 return, more specifically, Schedule E.[FN14]
The Husband prepared the returns, and same reflects that she received passive income from XXXX. Next, regarding the 2018 and 2019 returns, more specifically, Schedule E.[FN15]
She testified that in 2018, said Schedule reflects $32,903 in passive income and in 2019, said Schedule also reflects passive income. The joint tax returns from 2016 through 2019 were prepared by the Husband himself. In 2020, the joint tax returns were not prepared by the Husband because this matrimonial action had been commenced. While the parties filed jointly in 2020, a Certified Public Accountant prepared the return. In 2020, the Wife did not receive a W-2 Statement. She gave her Schedule K-1 and Form 1099 to the accountant who prepared the return. In an email chain between the Husband, the Wife and the accountant from September 27, 2021 through October 2, 2021,[FN16]
certain issues were addressed. The Wife did not answer the question in the email as she did not know the answer, but suggested to the accountant that she speak with her father, Mr. O. The Wife's actual participation in XXXX was not discussed in the email or outside of the email. For tax years 2016 through 2019, any income that the Wife received from XXXX was listed as "passive" income on the parties' jointly filed income tax returns. For tax years 2020 through 2021, any income that the Wife received from XXXX was listed as "nonpassive" income. When the Wife learned of this discrepancy, she called the accountant to ask for an explanation between passive and nonpassive, and why nonpassive was on the returns that the accountant. Thereafter, the Wife amended her tax return for year 2021. The Wife amended her 2021 tax return to reflect passive income from XXXX and she filed as "married filing separately". For year 2020, the parties filed a joint return, and she needed the Husband's permission to change the 2020 return.
The Wife testified about XXXX. She is a named officer of XXXX; more specifically, a Vice President. She became aware of the title of Vice President during the pendency of this [*6]action. She did not recall reading this earlier. Even as a Vice President, the Wife has not engaged in the day-to-day administration of XXXX's business. The Wife also has no idea of any policies or decisions that Mr. O makes, as he makes all of those decisions. Between year 2015 through the present, she was never asked to sign any XXXX documents, nor has she been asked to review any such documents. The Wife would only get some "drips and drabs" of information over time regarding XXXX.
The Wife testified about the family "meetings". The O Family call log [FN17]
was created by Mr. O. The Wife received a schedule of calls in 2021. There was no reference to XXXX board meetings on the schedule; this is because these calls were family calls consisting keeping up with each other as a family, Mr. O explaining financial ideas, Mr. O explaining how his tax class works and Mr. O explaining how estate planning works. On these family calls, the Wife's siblings were present. Sometimes, the Wife's mother was on the calls. These calls were scheduled monthly but there were only ten (10) in total, and some were cancelled. The calls were scheduled at 7:30 p.m. when the Wife's children were sleeping. There were no such family calls within the last year. During these calls, XXXX would come up as an example during Mr. O's lecture format on LLC's. These calls would also consist of going through family assets, and XXXX happened to be one of those assets. The calls were essentially lecture format from Mr. O.
The Wife testified about her journal.[FN18]
She kept it bedside in the former marital residence. She did not share her journal with her Husband, as it had her private thoughts in it. Nonetheless, the Husband took photographs of the pages of the journal and submitted it in court papers. The Wife kept notes in it regarding Mr. O's course at Columbia that he taught. XXXX was listed in her journal with a list of companies that XXXX invested in.
Cross Examination
Prior to March 1, 2015, there were no other investments with her parents and siblings. The LLC Agreement of XXXX was the formation document of XXXX without amendments. The Wife's parents each have a five (5%) interest in XXXX; the Wife and her two (2) siblings each have a thirty (30%) percent interest in XXXX. The Wife still has a thirty (30%) percent interest in XXXX, as do her siblings. The Wife acquired her thirty (30%) percent interest in XXXX from Mr. O. Mr. O never had more than a five (5%) percent interest. The Wife was, and is, unaware of any gift tax returns. The Wife was unsure how many entities that XXXX has an interest in.
The Wife signed her Statement of Net Worth dated March 15, 2021,[FN19]
and she reviewed it prior to signing it. The Wife listed her 2009 Toyota Highlander as a vehicle and listed that the source of funds to acquire was a gift from her parents. The Wife also listed investment accounts in her name with the source of funds to acquire same as a gift from her parents. The Wife acknowledged that while XXXX is listed on her Statement of Net Worth, she did not specifically denote that it was a gift from her parents under the "source of funds" section.
The Wife complied with financial disclosure requests during this action. The Wife's Response to Notice for Discovery & Inspection,[FN20]
which was dated August 18, 2021, provided responses to requests for gifts given to her from family members, and she provided documents responsive to that request. The Wife's Exhibit N [FN21]
to her Response to Notice for Discovery & Inspection lists various gifts from years 2016 through 2021 between $10,000 to $14,000 from her parents and grandmother, but makes no mention of her interest in XXXX.
The Wife's parents have substantial interests, specifically, tens of millions of dollars of interests. The Wife's grandmother has some wealth as well, and the Wife hopes to inherit from her parents and grandmother one day. If the Wife's father, Mr. O, passes away, the Wife retains her 30% interest in XXXX. The Wife was aware on the first day of the Hearing that there was a major issue as to how XXXX's income is treated in this case, and she called her accountant to amend her 2021 tax return, although the Wife admitted that she was not under audit. The Wife denied doing this as motivation to help her in this case, as she spent $6,000 in additional taxes for amending her return. When the Wife spoke with her accountant about amending her tax return, she did not send the accountant any documents. Thus, the accountant did not have XXXX's documents.
The Wife's meeting notes [FN22]
reflect that she took notes that Mr. O wanted estate planning, which was one of the benefits of XXXX. Those notes also reflect, in sum and substance, that if something happened to Mr. O, names of people were provided to help his family with XXXX. The Wife worked in affordable housing for two (2) years. She performed administrative work and she worked with attorneys and bankers. The Wife acknowledged that depreciation deductions are important in real estate, and that XXXX has real estate investments. The assets listed for the family had been discussed and there were notes made about XXXX. The present value of the companies were discussed during family meetings, but Mr. O stated nothing about XXXX's investment details. Mr. O did mention his projections on a spreadsheet with a value for each investment, but she could not recall if Mr. O discussed projected future income for each entity. The XXXX Investment Summary [FN23]
was a chart that Mr. O sent at the end of 2020 to the Wife and her siblings.
Re-Direct Examination
The Wife testified as to her Statement of Net Worth. The Wife listed her interest in XXXX as a "contingent interest" on her Statement of Net Worth as that is where she understood it to be, as it was part of Mr. O's estate planning.
The Wife testified as to the information she received regarding XXXX. Mr. O provided the information to the Wife to possibly involve herself in XXXX if Mr. O was no longer around, but to date, the Wife has had zero involvement in XXXX. Mr. O never spoke to the Wife about the strengths and weaknesses of XXXX, and Mr. O did not discuss how he selected the [*7]businesses that XXXX would invest in.
The Wife testified again as to the family meetings. While there were anywhere from ten (10) to twelve (12) family meetings in general, XXXX was part of the discussion for about two (2) or three (3) of those meetings.
The Wife testified about additional contributions to XXXX, and stated that she is unsure if Mr. O made any additional contributions to XXXX other than the initial $10,000.00.
The Wife testified about inheritance, and acknowledged that she will, some day, inherit from her parents.
Re-Cross Examination
The Wife acknowledged that she swore to the contents of her Statement of Net Worth and she knew that she had a 30% interest in XXXX on the date of said Statement of Net Worth, as she does today. The Wife has no idea how Mr. O selects the companies to invest in, except that she knows that Mr. O has other friends from work.
3. Testimony of M.M.
Direct Examination
M.M. (hereinafter referred to as "Ms. M") appears pursuant to a subpoena. She testified about what services she performed for the parties. She is a Certified Public Accountant and Financial Advisor. Ms. M prepared the parties' 2020 joint tax return. Prior to preparing the document, she communicated with both parties by email and both parties appeared on the email chains. In the preparation of the tax return, it was prepared through "Drake", a software tax preparation program. On Schedule E of the parties' 2020 tax return, the taxpayer reports income(s) from K-1's thereon. Box 28(A) lists XXXX income of $141,524, and there are two (2) options given: passive or nonpassive income. Here, the nonpassive income category was selected due to default of tax hardware. This means that the Schedule K-1 form was not checked, thus, it was denoted as nonpassive.
Ms. M testified regarding tax year 2021. For year 2021,[FN24]
the original return was prepared by Ms. M for the Wife individually. This original return treated XXXX income as nonpassive, and the nonpassive box was check because of the default method. This was amended after the return was filed. The Wife contacted Ms. M about amending the return, saying that she did not participate in XXXX and that it should be denoted as passive income. This conversation took place in or about May of 2023.
Cross Examination
Ms. M acknowledged that she prepared the 2020 return for both parties. Ms. M could not recall the date of the amended tax return for year 2021, but Ms. M confirmed that she only spoke to the Wife about the amended return. Ms. M spoke with the Wife's lawyer recently, after the Wife spoke with Ms. M of the possibility of amending the 2021 tax return. Ms. M made notes of the conversation with the Wife's counsel. Ms. M spoke with Mr. O regarding the preparation of the 2020 joint tax return once. The Husband was on that phone call but the Wife was not. The 2020 tax return was on extension and was filed in October, 2021. Mr. O never said that the 2020 return had an error in the return (i.e., passive versus nonpassive). The first time that Ms. M became aware of an error in the return was when the Wife spoke with her at the end of April or [*8]towards the beginning of May in 2023, and the Wife called to ask Ms. M about the income classification of the K-1 from XXXX. Ms. M acknowledged that there was no audit or notice from the Internal Revenue Service. Ms. M told the Wife that there would be additional taxes on the amended return. There were approximately $5,000 of additional taxes as a result of the amended return for year 2021. Ms. M prepared the amended return and is not sure if she will send an invoice for the preparation for same. Ms. M did not ask the Wife for additional documentation. Ms. M was not sure if XXXX was a partnership, and XXXX's Form 1065 was not seen by Ms. M.
There was testimony concerning XXXX's U.S. Partnership Tax Return for year 2020.[FN25]
The analysis of the net income shows various types: $588,857 in individual active and $588,863 in individual passive. The Wife called Ms. M to tell her that nothing was active. When asked if she did her due diligence to see how the corporation classifies income, she responded that this is not what she normally does. She simply spoke to the Wife. The Court proceeded to take judicial notice of IRS Circular 230 regarding the regulations of "due diligence" by a tax preparer. Personal tax returns are typically completed by viewing the Schedule K-1 and speaking to the client. Ms. M reviews the tax return before filing, after sending the return to the client. In 2020, she checked both returns to the best of her ability. Ms. M is not being compensated for her testimony. Ms. M testified that the basis for reclassifying income in 2021 did not include any documents or the Schedule K-1; rather, she spoke with the Wife, which caused her to amend the 2021 return.
Re-Direct Examination
Ms. M did not prepare XXXX's 2020 U.S. Partnership return. Ms. M does not know who receives the active income and/or who receives the passive income as reflected on this particular return. Ms. M could not say that the Wife's income could be classified as active under this return.
Ms. M reviewed the Wife's Schedule K-1 regarding the amended return and spoke with the Wife; she did not ask the Wife for any documents because it was not "common practice".
Re-Cross Examination
Ms. M felt as if she did everything she needed to do and complied with her requirement of due diligence under the IRS rules and regulations.
B. Husband's Case:
1. Testimony of the Husband
Direct Examination
The Husband testified as to background information. The parties were married on August 24, 2013 and have three (3) children. The parties have joint legal custody of the children and the Wife is designated the "residential" parent of the three (3) children. He seeks the children "regularly".
The Husband testified as to the family "zoom" meetings. The Husband was aware of the virtual meetings held by the Members of XXXX. He was aware of them from the Wife and because of the sharing of calendars for them. The children were home during these meetings and they were being watched by and taken care of by the Husband. The monthly meetings took place [*9]in 2019 or 2020.
The Husband testified as to his knowledge about XXXX and the finances of the Wife's parents. XXXX was established in 2015. The Wife would share information on XXXX with the Husband from "time to time", including her Schedule K-1's. The Wife told him it was an LLC and that it was a "business" with her family. She told the Husband that XXXX was a holding company for investments consisting of thirty (30) to thirty-one (31) entities. There were a "variety" of investments. The Husband never discussed with the Wife that her interest in XXXX be held for the future. The Wife said that her parents had a $70,000,000.00 estate outside of XXXX.
The Husband testified regarding tax returns and the payment of taxes. The Husband, Ms. M and Mr. O were on the phone together regarding the parties' 2020 income tax return, with Ms. M sending an email regarding the tax treatment of the "business". This action was commenced on February 8, 2021. For tax year 2020, the parties' filed jointly, and Ms. M prepared the return. Prior to tax year 2020, the Husband himself prepared the parties' tax returns. From years 2016 to 2019, XXXX's income was treated as "passive" income because the Wife said it was. However, no documentation was provided to that effect. The Husband only saw the Wife's Schedule K-1's. The income that the Wife received from XXXX, including interest and dividend income, was reflected on the parties' jointly filed income tax returns through tax year 2020. Distributions in cash from XXXX were showed later in the return. Thus, the withholdings were insufficient, and the deficiency was paid by way of estimated taxes. The source of payment of estimated taxes were paid from joint funds and/or from the Husband's checking account funding by the Husband's W-2 income. The IRS Payment Record from 2019 to 2020 [FN26]
from the Husband's account at IRS.gov reflects payments outside of his W-2's for estimated tax payments from his account at Charles Schwab to the IRS for year 2020. He made these payments, as confirmed by his records. The Husband's Charles Schwab statement ending October 30, 2020 [FN27]
reflects a payment of $28,449.00 to the IRS on October 9, 2020. It also reflects a payment of $60,000.00 to the IRS on October 16, 2020. The Husband's Charles Schwab statement ending April 30, 2019 [FN28]
reflects a payment of $3,000.00 to the IRS on April 1, 2019. The Husband also made a $50,000.00 estimated tax payment electronically to the IRS on December 30, 2019.
Cross-Examination
The meeting of the Members of XXXX were attended by Mr. O, his spouse, the Wife and her two (2) siblings. Those meetings were held via the "zoom" virtual platform. The Husband characterized these meetings as "board meetings". The Wife shared with the Husband her "Google" calendar of the meetings on zoom. The "schedule", however, does not reflect "XXXX board meeting". XXXX does not appear on this schedule. What appears on the schedule is "O Family Call", which appears on each calendar invite. There were twenty-six (26) meetings scheduled on the document, and all twenty-six (26) of them reflect "O Family Call". There are no documents in evidence reflecting an XXXX Board meeting.
At his examination before trial, the Husband said he had no knowledge of what was discussed at the family meetings. When the Wife attended the meetings, the children were with the Husband. All of these "calls" were scheduled to begin at 7:30 p.m. In 2018, bedtime for the children was structured, and in 2018, it was between 6:30 p.m. and 7:00 p.m. Sometimes, the children were already asleep when the Husband returned home from work. Generally, the family zoom meetings ended around 8:30 p.m. In 2018, only two (2) of the children were born. In 2021, the parties had three (3) children, and their ages were six, four and two. In 2021, the children's bedtime was between 7:00 p.m. to 7:30 p.m.
The Wife would share XXXX information with the Husband from time to time, which consisted of her sharing her Schedule K-1's. Prior to the commencement of this action, the Husband prepared the parties jointly filed tax returns, as he was interested in doing same as a financial professional. He needed the Wife's Schedule K-1's which she gave to him, as they were necessary to prepare the returns. At his examination before trial, the Husband said that the Wife shared no information about the O family calls with him. He did not ask questions of the Wife about the meetings. He also reviewed the notes of the O family meetings prepared by the Wife's brother. The Husband took a photograph of the Husband and Wife's computer. He also performed a name search of the Wife's brother. The Husband testified to opening emails from third parties and spread sheets of XXXX's investments. Much of the Husband's knowledge about XXXX came from going onto the computer and opening documents.
With respect to the jointly filed tax returns from years 2016 through 2019, on each of these returns, the Husband prepared the returns and represented XXXX's income as passive. The preparer must certify the returns as true, accurate and complete, thus, the Husband made that declaration with respect to those returns. At his examination before trial, the Husband acknowledged that he is a meticulous guy, thus, he trusted the Wife when she said that the income was "passive".
The Husband would generally make the estimated tax payments from his Charles Schwab account which was primarily funded from his W-2 earnings and joint funds. The $60,000 payment from his Charles Schwab account came from a "combination" of their funds. However, on October 1, 2020, there was an $80,000 deposit from an account, which reflects a transfer from the Wife on that statement. While the Husband stated that the $80,000 was from their joint account, the $80,000 actually came from the Wife's Fidelity account. The $50,000 estimated tax payment also came from the Wife's Fidelity account.
Re-Direct Examination
The Husband testified again regarding tax payments he made. He reiterated that there was a withdrawal from the IRS from his Charles Schwab account in the amount of $28,449, which was funded by his W-2 earnings and joint funds.
The Husband testified about a tax refund. The parties received a New York State tax refund of $15,244 on October 22, 2020, which was payable to both parties.
The Husband testified about XXXX's income. XXXX's income (the distributions) were taxable to the Wife, but there were no withholdings. The Wife's income from XXXX was deposited into her Fidelity account. The Wife transferred some money for the families' day-to-day needs and tax payments.
The Husband testified about the O family meetings. During the family meetings, the [*10]children were generally awake, and the Husband would attend to the children.
Re-Cross Examination
The re-cross examination of the Husband was insubstantial.
C. Wife's Rebuttal Case
1. Testimony of Mr. O
Direct Examination
Mr. O testified generally regarding XXXX. The Certificate of Incorporation of XXXX dated February 26, 2015 [FN29]
reflects that Mr. O had 100% of the ownership interest in XXXX on that date. The LLC Agreement of XXXX dated March 1, 2015 reflects that it was signed on March 1, 2015 and that Mr. O distributed his ownership interest to the Wife, Mr. O and his children. It reflects that Mr. O owns five (5%), his spouse owns five (5%), and the three (3) children each own thirty (30%) percent.
Mr. O testified about XXXX's tax return(s). XXXX's 2016 U.S. Partnership Return,[FN30]
which was prepared by Mr. O in 2017, reflects income in two boxes: active and passive. Mr. O's income was denoted as "active" because he was the only active member of XXXX. On subsequent XXXX tax returns, any active income denoted thereon was exclusively the income of Mr. O.
Cross Examination
Mr. O acknowledged that the word "owner" is not reflected in the Certificate of Incorporation of XXXX. He also acknowledged that the $10,000.00 initial capital contribution was made after March 1, 2015, and thus, when Mr. O signed the Certificate of Incorporation, there were no funds in XXXX.
Mr. O was asked questions regarding XXXX's income in 2016. He testified that the active income in 2016 translated to five (5%) of the total income of $162,989, and the same methodology was used in future years. In 2016, the sum of $588,857 was listed as active and the sum of $588,863 was listed as passive; thus, the active amount listed was not 5%. Mr. O determines how to allocate the income, and he makes the judgment as to how much money everyone is to receive.
Mr. O acknowledged that there are no books and records of XXXX.

 DISCUSSION + ANALYSIS
In rendering this Decision and Order, the Court's consideration is limited to the testimony and evidence presented at the Hearing by the parties. In this respect, the Court has had the chance to observe the sincerity, temperment and demeanor of the parties. This Court, consequently, is in the best position to gauge the credibility of the parties. Fugazy v. Fugazy, 44 AD3d 613 (2d Dept. 2007); Campione v. Alberti, 98 AD3d 706 (2d Dept. 2012); Manning v. Manning, 82 AD3d 1057 (2d Dept. 2011). The Court describes Mr. O's as a sincere, credible, candid and confident witness. The Court describes the Wife as a credible witness. The Court found the Husband to be a credible witness. The Court found Ms. M to be a credible witness.
CLASSIFICATION - MARITAL OR SEPARATE
Introduction
The purpose of the Hearing had before the Court was to effectively determine two questions: (1) whether or not the Wife's interest in XXXX is marital property subject to equitable distribution or whether or not the Wife's interest in XXXX is separate property, or (2) if classified as separate property, whether or not the Husband has a claim in and to any appreciation of the value of Wife's interest in XXXX.
Classification
DRL § 236(B)(4)(b) provides:
"...[a]s soon as practicable after a matrimonial action has been commenced, the court shall set the date or dates the parties shall use for the valuation of each asset. The valuation date or dates may be anytime from the date of commencement of the action to the date of trial..."
DRL § 236(b)(5)(a) also provides, in part:
"...the court, in an action wherein all or part of the relief granted is divorce, or the dissolution...of a marriage...shall determine the respective rights of the parties in their separate or marital property..."
In a matrimonial action, the court must determine the respective rights of the parties in their separate or marital property. Eschemuller v. Eschemuller, 167 AD3d 983 (2d Dept. 2018). Pretrial classification of assets is, of course, encouraged. See Antenucci v. Antenucci, 193 AD2d 948 (3d Dept. 1993) citing Yovino, The Authority and Obligation of the Trial Court to Classify Assets and Select Proper Valuation Dates Prior to Trial, 23 NY St. Bar Assn Fam. L. Rev. No. 2, 25, 25-26 [1991]; see also Carter v. Fairchild-Carter, 199 AD3d 1291 (3d Dept. 2021). The initial determination of whether a particular asset is marital or separate property is a question of law. See DeJesus v. DeJesus, infra; see also Renck v. Renck, 131 AD3d 1146 (2d Dept. 2015); see also Belmonte v. Belmonte, 211 AD3d 1131 (3d Dept. 2022); see also Lapoint v. Claypoole, 195 AD3d 1541 (4th Dept. 2021); see also Szypula v. Szypula, 211 AD3d 156 (3d Dept. 2022).
Marital Property - Defined
The Court of Appeals has defined Domestic Relations Law § 236 as sweeping. See generally DeJesus v. DeJesus, 90 NY2d 643 (1997) (emphasis added). DRL § 236(B)(1)(c) provides:
The term "marital property" shall mean all property acquired by either or both spouses during the marriage and before the execution of a separation agreement or the commencement of a matrimonial action, regardless of the form in which title is held, except as otherwise provided in agreement pursuant to subdivision three of this part. Marital property shall not include separate property as hereinafter defined.
Domestic Relations Law § 236 defines "marital property" as all property acquired by [*11]either or both spouses during the marriage and before the execution of a separation agreement or the commencement of a matrimonial action, regardless of the form in which title is held, and the definition of marital property includes a "wide range" of tangible and intangible interests. See generally Fields v. Fields, 15 NY3d 158 (2010) (internal citations omitted); see DRL § 236(B)(1)(c), supra. Property acquired during the marriage is presumed to be marital property and the party seeking to overcome such presumption has the burden of proving that the property in dispute is separate property. Ferrante v. Ferrante, 186 AD3d 566 (2d Dept. 2020); see also Massimi v. Massimi, 35 AD3d 400 (2d Dept. 2006); see also Palazolo v. Palazolo, 200 AD3d 700 (2d Dept. 2021) (statutory presumption that all property acquired by either spouse during the marriage, unless clearly separate, is marital property, regardless of the form in which title is held). Domestic Relations Law § 236 creates a presumption that all property, unless clearly separate, is deemed marital property. Renck v. Renck, 131 AD3d 1146 (2d Dept. 2015) (emphasis added). The Legislature, in defining this basic term "marital property", intended that the term should be construed broadly in order to give effect to the "economic partnership" concept of the marriage relationship recognized in the statute. Price v. Price, 69 NY2d 8 (1986); see also Mesholam v. Mesholam, 11 NY3d 24 (2008). The law favors the inclusion of property within the marital estate. LeRoy v. LeRoy, 274 AD2d 362 (1st Dept. 2000).
Separate Property - Defined
DRL § 236(B)(1)(d) provides:
The term separate property shall mean:
(1) property acquired before marriage or property acquired by bequest, devise, or descent, or gift from a party other than the spouse;
(2) compensation for personal injuries;
(3) property acquired in exchange for or the increase in value of separate property, except to the extent that such appreciation is due in part to the contributions or efforts of the other spouse;
(4) property described as separate property by written agreement of the parties pursuant to subdivision three of this part.
Separate property shall remain such. DRL § 236(B)(5)(b). Separate property is described in the statute as being an exception to marital property. Pullman v. Pullman, 176 AD2d 113 (1st Dept. 1991). Separate property is to be viewed narrowly. Spera v. Spera, 71 AD3d 661 (2d Dept. 2010); see also Sieger v. Sieger, 37 AD3d 585 (2d Dept. 2007). Separate property includes, inter alia, property acquired before marriage or property acquired by bequest, devise, or descent, or gift from a party other than the spouse. Silvers v. Silvers, 197 AD3d 1195 (2d Dept. 2021). Separate property also includes property acquired in exchange for or the increase in value of separate property, except to the extent that such appreciation is due in part to the contributions or efforts of the other spouse. Price v. Price, 69 NY2d 8 (1986). Separate property is required to remain separate for the purposes of equitable distribution. Cudar v. Cudar, 98 AD3d 27 (2d Dept. 2012).
Wife's Thirty (30%) Percent Interest in XXXX
Here, these parties were married on August 24, 2013.[FN31]
XXXX was formed on February 26, 2015, as reflected on its Certificate of Incorporation.[FN32]
The LLC Agreement of XXXX [FN33]
is dated March 1, 2015, which reflects, inter alia, that the Wife received her thirty (30%) percent interest in XXXX on said date. Inasmuch as the Wife acquired her thirty (30%) percent interest in XXXX on March 1, 2015, which was after the date of the parties' marriage, her thirty (30%) percent interest in XXXX is presumed to be marital property. See generally Rosenberg v. Rosenberg, 145 AD3d 1052 (2d Dept. 2016) (property acquired during the marriage is presumed to be marital property).
The burden now shifts to the Wife to prove that her thirty (30%) percent interest in and to XXXX is separate property. See Clark v. Clark, 117 AD3d 668 (2d Dept. 2014) (party seeking to overcome such presumption has the burden of proving that the property in dispute is separate property). The Wife does not claim that her interest in XXXX was acquired before the parties' marriage; she does not claim that it was acquired as compensation for personal injuries, nor does she claim that it was acquired in exchange for separate property. Lastly, she does not claim that it was acquired by written agreement of the parties. The Wife claims, among other things, that her thirty (30%) percent interest in XXXX was acquired for estate planning purposes by her father, Mr. O, and that her thirty (30%) percent residual interest was gifted to her from Mr. O. The Court examines those claim(s) (see infra), and finds that the Wife has met her burden and rebutted the presumption (see infra). 
The hallmark of a gift is that it is a voluntary transfer of property without consideration or compensation. Batease v. Batease, 71 AD3d 1344 (3d Dept. 2010); see also Wilcox v. Wilcox, 233 AD2d 565 (3d Dept. 1996). The inquiry focuses on the subjective intent of the donor at the time of the conveyance. Matter of Ajamian, 270 AD2d 724 (3d Dept. 2000) (emphasis added). As the Court of Appeals has written:
"...[f]irst, to make a valid inter vivos gift there must exist the intent on the part of the donor to make a present transfer; delivery of the gift, either actual or constructive to the donee; and acceptance by the donee. Second, the proponent of a gift has the burden of proving each of these elements by clear and convincing evidence..."
Mirvish v. Mott, 18 NY3d 510 (2012).
Secondary authority provides the Court with additional guidance with respect to gifts. 62 NY Jur Gifts § 1 provides:
A gift is a voluntary transfer of property without consideration or compensation, by which the donor manifests an intent that there be a present and irrevocable transfer of the title of the subject matter of the gift to a donee, who accepts the gift. The validity of the gift is [*12]not affected by a lack of consideration. The gift depends upon no agreement, but only upon the voluntary act of the donor.
As long as the evidence establishes an intent to make a present and irrevocable transfer of title or of the right of ownership, there is a present transfer of some interest, and an inter vivos gift is effective immediately. See 62 NY Jur Gifts § 5. The validity of a gift must be determined in accordance with the law of the place where the transaction occurred. See 62 NY Jur Gifts § 6. A gift must be established by clear, convincing, and satisfactory evidence, but the evidence must be carefully and critically scrutinized. See generally 62 NY Jur Gifts § 7. While generally a gift is not presumed, when an inter vivos gift is of value to the donee, the law presumes acceptance. See generally 62 NY Jur Gifts § 9. New York courts have further recognized that a valid gift will not be nullified by a statement that the transfer was for value received, where the consideration expressed is nominal or out of all proportion to the property's value. See 62 NY Jur Gifts § 14.
Here, the LLC Agreement of XXXX reflects that the Members shall contribute a total of $10,004 of cash to the capital of XXXX.[FN34]
Specifically, Article Two of the LLC of XXXX provides:

ARTICLE TWO

 Members and Capital
2.1 The Members shall contribute a total of $10,004 of cash to the capital of the Company which cash contributions shall be contributed as follows:

Name

Amount

Percentage

Mr. O.

$10,000

5%

K

$1

5%

Wife

$1

30%

A

$1

30%

B

$1

30%

The Court finds that the Wife's $1.00 contribution was a nominal contribution, and, therefore, nominal consideration. A transfer of property is a gift only if given without or for only nominal consideration. Landmark West! v. City of New York, 9 Misc 3d 563 (Supreme Court New York County 2005). Inasmuch as the Wife's consideration of a $1.00 capital contribution for a thirty (30%) percent interest in XXXX was nominal, it was effectively tantamount to no consideration, as compared to Mr. O's $10,000.00 capital contribution for a five (5%) percent [*13]interest in XXXX. Such nominal consideration of only $1.00 will not nullify the validity of the gift that the Wife received, especially in light of the fact that the stated contribution of $1.00 (which was not actually contributed) is equivalent 0.0001, which is so grossly disproportionate to the sum that Mr. O actually contributed, to wit: $10,000.00. See 62 NY Jur Gifts § 14, supra. In any event, the Court finds that Mr. O credibly testified that, in effect, notwithstanding and irrespective that the LLC Agreement of XXXX provided that the Wife was to contribute the sum of $1.00 for her thirty (30%) percent interest in and to XXXX, the $1.00 from each of the other four (4) members of his family was not actually contributed. The validity of Mr. O's gift to the Wife of her thirty (30%) percent interest in XXXX is unaffected by this lack of actual consideration, nor is it affected by the stated (but noncontributed) $1.00 nominal consideration. See NY Jur Gifts § 1, supra,
The Court likewise finds that Mr. O credibly testified that XXXX was formed for purposes of holding certain investments and facilitating estate planning, given the circumstances surrounding why XXXX was formed, namely, Mr. O's health condition in 2015 in having a tumor located in his esophagus. The Court examined Mr. O's demeanor carefully during this testimony and line of questioning. While Mr. O did not come across as a "warm and fuzzy" type of father, his testimony during this line of questioning demonstrated a marked concern that his condition at the time could have been fatal. The Court found this testimony to go to the heart of his subjective intent at the time that the Wife acquired her thirty (30%) percent interest: that said thirty (30%) be effectively given to her without consideration, or for nominal consideration.
First, as to Mr. O's intent, the Court finds that his subjective intent at the time of the transfer (see Matter of Ajamian, supra), was to provide the Wife with a present transfer of a gift (see Mirvish, supra) of thirty (30%) percent of XXXX. Mr. O's intent was to make this present transfer without the Wife actually having to contribute any funds towards same, i.e., without consideration or actual compensation. See 62 NY Jur Gifts § 1, supra. Additionally, there is no present transfer without evidence of a present irrevocable transfer of title. Estate of Lee J. Pugh, 2010 NYLJ LEXIS 1420 (Surrogate's Court Kings County 2010). A careful review of the LLC Agreement of XXXX does not reflect that Mr. O could, in effect, unilaterally or otherwise by consent of the other Members of XXXX, revoke the Wife's thirty (30%) percent interest in XXXX. In fact, the LLC Agreement of XXXX provides:

 
 ARTICLE THREE

 
 Rights and Duties of the Members
3.1 The Members are hereby vested with the full, exclusive and complete right, power and discretion to operate, manage and control the affairs of the Company and to make all decisions affecting the Company affairs. All decisions shall be made by 'Mr.O', and if he is no longer alive K, and if she is no longer alive by a majority of Member percentage interests ("Majority Vote") of the remaining members.
3.2 The following persons are the initial officers hereby designated by the Members and shall hold the offices listed next to their respective names:
Mr. O President
K Executive Vice President
L. F Vice President
A Vice President
B Vice President

 * * *

 
 ARTICLE FOUR

 
 Term
The term of the Company shall commence on the date of this Agreement and shall continue in full force and effect until December 31, 2111, unless the Company is previously dissolved in accordance with the Delaware Act or at the election of the Members.
The LLC Agreement of XXXX is noticeably silent as to any procedure(s) to remove any of the Members of or revoke their percentage interests in XXXX, which leads the Court to conclude that the Members of XXXX cannot be removed, and that the rights and duties are effectively only affected by death and then, if both Mr. O and Mrs. O are deceased, by a majority of the Member percentage interests, which includes the Wife. The expiration date of XXXX is December 31, 2111. The date of the LLC Agreement is March 1, 2015. The Court notes that the LLC Agreement of XXXX therefore remains in effect for ninety-six (96) years. Given all of the aforesaid taken in toto, the Court finds that Mr. O intended to give the Wife an irrevocable transfer of thirty (30%) percent of XXXX. See 62 NY Jur Gifts § 5, supra. The Court finds, therefore, that it was established by clear and convincing evidence that Mr. O made a present and irrevocable transfer of the gift.
Second, as to Mr. O's delivery of the gift of a thirty (30%) percent interest in XXXX, the delivery of the subject of the gift or a constructive or symbolic delivery such as by an instrument of gift, sufficient to divest the donor of dominion and control over the property. Gruen v. Gruen, 68 NY2d 48 (1986); see also Matter of Szabo, 10 NY2d 94 (1961). Here, the Court finds the LLC Agreement of XXXX to be the instrument of gift inasmuch as same reflects that the Wife was to contribute a nominal sum of $1.00 as and for a thirty (30%) percent interest in XXXX. The Court finds, therefore, that it was established by clear and convincing evidence that there was delivery of the gift.
Third, as to the Wife's acceptance of her gift of thirty (30%) percent interest in XXXX, the Court finds that acceptance is met inasmuch as that the Wife's signature indisputably appears on page "4" of the LLC Agreement of XXXX, after the phrase "...in witness whereof [capitalization in original], the parties have executed this Agreement as of the date first above written..." under the word "Members". Not only that, acceptance may be implied where the gift, otherwise complete, is beneficial to the donee. Mortellaro v. Mortellaro, 91 AD2d 862 (4th Dept. 1982). The law will also presume an acceptance when the gift is of value. In re Estate of Partos, 203 AD2d 578 (2d Dept. 1994). Here, there can be no doubt that the Wife receiving a thirty (30%) percent interest in an LLC, namely, XXXX, where Mr. O contributed $10,000, is beneficial to her and is of value to her. In any event, the documentary evidence in the Record at the Hearing proves that the Wife's thirty (30%) percent interest if of value to her, as she received [*14]$49,874 in ordinary business income in 2016,[FN35]
 $20,854 of ordinary business income in 2017,[FN36]
 $27,707 of ordinary business income in 2018,[FN37]
 $117,855 of ordinary business income in 2019,[FN38]
and $141,359 of ordinary business income in 2020.[FN39]
See generally 62 NY Jur Gifts § 9, supra. The Court finds, therefore, that it was established by clear and convincing evidence that the Wife accepted the gift.
The Court does not find that the Wife's failure to file a gift tax return dilutes her argument that her thirty (30%) percent interest was a gift. As the Court of Appeals partially wrote in Gruen, while such an omission [the failure to file a gift tax return], "...sometimes may indicate that the donor had no intention of making a present gift, it does not necessarily do so and it is not dispositive in this case..." Gruen, 68 NY2d at 54; see also In re Estate of Varrone, 2021 NYLJ LEXIS 592 (Surrogate's Court Queens County 2021) (failure to file a gift tax return is not uncommon and while the existence of a gift tax return would constitute strong evidence of intent, its absence is not, in and of itself, determinative of the issue). Here, the absence of a gift tax return does not dilute the Wife's rebuttal of the presumption of marital property, nor is it suggestive that the Wife did not acquire her thirty (30%) percent interest in XXXX as a gift. Notably, the credible evidence at the Hearing proven by clear and convincing evidence was that the Wife contributed nothing to her acquisition to her thirty (30%) percent interest in XXXX, along with Mr. O's testimony surrounding the circumstances surrounding the creation of XXXX, which the Court finds most compelling that it was a gift. Whether or not a gift tax return should have been filed with the requisite taxing authorities is a question for purposes of taxation; not for the classification of an asset for this Court.
Next, unpersuaded is the Court by the Husband's argument regarding the Wife's discovery responses. The Husband's Notice for Discovery & Inspection [FN40]
and the attendant "Rider" thereto specifically requests "...documents for the period January 1, 2016 to the present time, unless otherwise indicated..." Request "22" of the Husband's Notice for Discovery & Inspection requests "...[r]ecords pertaining to bequests, legacies or gifts (over $1,000.00) received by you, including XXXX, LLC..." The Wife's Response to Notice for Discovery & Inspection [FN41]
reflects a response to Request "22" of "...[s]ee gifts given to Plaintiff from her family annexed hereto as Exhibit "N". The Wife's Exhibit "N"[FN42]
to her Response reflects a list of "...[g]ifts to L. from [*15]Family..." for years 2016, 2017, 2018, 2019, 2020 and 2021. There is no dispute that the Wife acquired her interest in and to XXXX on March 1, 2015, which was before the time period requested in the Husband's Notice for Discovery & Inspection. The Husband's Notice for Discovery & Inspection did not provide an exception in Paragraph "22" of the Rider for anything acquired prior to 2016. Therefore, the Court does not find that the absence of such information and/or documentation in her discovery production is, in effect, a waiver of or something that belies the Wife's claim that her interest in XXXX was a gift.
Moreover, the Court is likewise unmoved by the Husband's argument regarding the Wife's Statement of Net Worth.[FN43]
The Court credits the Wife's testimony that her interest in XXXX was listed under the section entitled "contingent interests" was placed there because that is, in effect, where she thought it should be placed. The Court finds it of no moment that she failed to state "gift from Wife's parents", or something to that effect, in the "source of acquisition to acquire" inasmuch as whether something is a gift to the extent of rebutting the presumption of marital property is a question reserved for the province of this Court, not the parties. In any event, the mere fact that the Wife failed to fill-in the section entitled "source of acquisition to acquire" does not estopp her from claiming that her thirty (30%) interest in XXXX was a gift. The absence thereof is not dispositive on whether or not such interest is a gift or not.[FN44]

Furthermore, the Court is also unconvinced by the Husband's argument regarding the consideration, namely, that since the LLC Agreement of XXXX reposes in the Wife the responsibility and authority for the operations of XXXX, she, in effect, actually gave consideration. The credible testimony at the Hearing, which included testimony from Mr. O himself and the Wife, was, in sum and substance, that Mr. O makes all of the decisions, prepares tax returns, signs documents, does not seek the opinions of the other members of XXXX, that the other members of XXXX do not volunteer opinions, that the consent of the other members of XXXX was never sought, and that Mr. O did not notify the other Members of XXXX purchases because he is the "sole decision-maker". As reflected in the Transcript of the Hearing on April 27, 2023:
Q: I think the judge asked you this question, but just so I'm sure, bear with me. Before you made a decision to purchase any of these companies for XXXX, did you seek the opinion of any of the other members of XXXX?
A: No.
Q: Whether you sought the opinion of the other members of XXXX or not, did any of those members volunteer their opinion as to any of these purchases?
A: No.
Q: Before making these purchases, did you seek the consent of the other members of XXXX:
A: No.
Q: At the time that you made these purchases, did you advise the other members contemporaneously that XXXX was purchasing these companies?
A: No.
Q: Any why, Mr. O'Toole, did you not seek their consent or advise them as to these purchases before making them?
A: Because I was the sole decision-maker.
See Transcript from Hearing, April 27, 2023, page 33, lines 6-25, and page 31, line 7.
The Court credits this testimony. Also, the Court heard testimony from the Wife regarding, in sum and substance, her purported involvement in XXXX, and found her to be a credible and direct witness. Her credible testimony on May 8, 2023 revealed, in part:
Q: Now, can you direct your attention to Article Three of the operating agreement, and can I ask you just to read the first sentence of 3.1?
A: The Members are hereby vested with the full, exclusive and complete right, power, and discretion to operate, manage and control the affairs of the company, and to make all decisions affecting the company affairs.
Q: To what extent, L., have you participated in the operation of the company?
A: Not at all.
Q: To what extent have you participated in controlling the affairs of the company?
A: Not at all.
Q: And to what extent, if at all, have you participated in the managing of the company?
A: Not at all.
Q: Were [sic] this agreement — you read where the agreement says, you and the other members have a right to make all the decisions affecting the company; is that correct, is that what the document says?
A: Yes, I did read that. Yes.
Q: What decisions have you made with respect to the XXXX?
A: I haven't made a single decision regarding XXXX.
See Transcript from Hearing, May 8, 2023, page 25, lines 20-25, and page 26, lines 1-18.
 
 * * *
Q: Could you read into the record, please, the next phrase that is contained in 3.3, just the first half of that paragraph, please?
A: The officer shall be responsible for the day-to-day administration of the business of the company subject to the control and direction of the members.
Q: Stop there, please. To what extent, L., have you, as vice president, been responsible or engaged in any responsibility for the day-to-day administration of the business of the company?
A: Not at all.
Q: Now, please read the second half of the phrase that appears in 3.3.
A: And shall have the responsibility and authority to implement the policies and the decisions of the members.
Q: What have the policies that the members of XXXX made?
A: I don't know. My dad makes all the decisions.
Q: Between 2015 and today, on how many occasions have you been asked to sign any XXXX documents?
A: Zero.
Q: Between 2015 and today, on how many occasions have you been asked to review any XXXX documents?
A: Zero.
Q: Do you understand what the nature of XXXX's business is?
A: I understand it to be my dad investing in things he thinks will do well financially through his job at R companies.
Q: Have you become aware of the nature of the business at all?
A: I've been given some dribs and drabs over time?
Q: Who have you been given those dribs and drabs from?
A: My father.
See Transcript from Hearing, May 8, 2023, page 50, lines 20-25, page 51, lines 1-25, and page 52, lines 1-7.
Additionally, the Court is cognizant of - but unpersuaded by - the Husband's argument, in effect, that because the initial $10,000.00 capital contribution from Mr. O was not a gift, the Wife's thirty (30%) percent interest in XXXX cannot be a gift. The short of it is that in this Court's view, Mr. O did not gift or give $10,000.00 to his three (3) children; either individually or spread three ways; rather, he gifted percentages of interest(s) in and to XXXX, which is an Limited Liability Company. While Mr. O may have provided the additional capital, the Operating Agreement also provides that "...[d]istributions shall be made to pay a 7% per annum return on capital, then to return capital contributions..."[FN45]
Inasmuch as Mr. O was - and is - entitled to a return on his capital - the Court does not find the fact that his initial $10,000 may not have been a gift to be dispositive on whether or not the Wife's thirty (30%) percent interest in XXXX was a gift. Just because Mr. O's initial $10,000.00 capital contribution was not a gift does not mean that the Wife's thirty (30%) percent interest in XXXX was not a gift.
The Court must address the topic of Mahoney-Buntzman v. Buntzman, infra, as argued by the Husband. The Court declines to adopt the Husband's position that by representing to the Internal Revenue Service that the Wife's activity was active, that the Wife cannot take a contrary position at the Hearing. This argument is littered throughout his post-Hearing Memorandum and his Supplemental Memorandum, and while the Court has considered it, it finds such argument to be shopworn. This Court certainly recognizes the Court of Appeals holding in Mahoney-[*16]Buntzman v. Buntzman, which provides, inter alia, that a party to litigation may not take a position contrary to a position taken in an income tax return. Mahoney-Buntzman v. Buntzman, 12 NY3d 415 (2009). However, the parties pre-and-post-commencement income tax returns are conflicting (to some degree) in this regard, so the Court declines to apply the principles of Mahoney-Buntzman to both parties, as, to some degree, they both have effectively taken inconsistent positions (see infra).
In furtherance of the aforesaid, the evidence in the Record at the Hearing reflects, among other things, that the parties' jointly filed 2016 income tax return reflects passive income from Schedule K-1 of $49,874.[FN46]
The parties' jointly filed 2017 income tax return reflects passive income from Schedule K-1 of $20,854.[FN47]
The parties' jointly filed 2018 income tax return reflects passive income from Schedule K-1 of $27,707.[FN48]
Schedule E from the parties' jointly filed 2019 income tax return reflects passive income from Schedule K-1 of $104,059.[FN49]
However, the evidence in the Record at the Hearing reflects, among other things, that the parties Schedule E from the parties' jointly filed 2020 income tax return reflects nonpassive income from Schedule K-1 of $141,524, and that the parties' Schedule E from Wife's 2021 tax return reflects nonpassive income from Schedule K-1 of $172,288.[FN50]
The Court cannot ignore the fact that for years 2016 through 2019, the Husband himself prepared the parties' jointly filed income tax returns (which he himself presumably signed and submitted to the IRS and New York State) and certified therein that the income from XXXX was passive income. Because of these conflicting positions taken by both parties on their tax returns, the Court declines to apply Mahoney-Buntzman in this instance and to the facts of this matter.
In short summary, while the Husband espouses a position that the Wife cannot take inconsistent positions in this litigation as she did on tax returns, the same standard would ring true for him. In any event, there is no evidence in the Record that the Wife's conduct (or lack thereof) during the years that the parties filed joint tax returns - prepared by the Husband - in which it was represented that the income from XXXX was passive was any different than the two (2) years that joint income tax returns were filed representing the income from XXXX to be nonpassive. That conduct was no different before or after the Wife amended her 2021 income tax return during the litigation to reflect that the income from XXXX was passive instead of nonpassive. In other words, the Wife's conduct (or lack thereof) with respect to XXXX remained exactly the same during those six (6) years that tax returns were filed. Additionally, the amendment to the Wife's 2021 tax return that she made during the litigation - and during the Hearing - was simply consistent with how the parties previously jointly filed income tax returns.
Accordingly, for all of the aforesaid reasons, the Court finds that the Wife has rebutted [*17]the presumption that her thirty (30%) percent interest in and to XXXX is marital property, as the Wife acquired her thirty (30%) percent interest in and to XXXX by gift from Mr. O. See DRL § 236(B)(1)(d)(1); see also Mula v. Mula, 131 AD3d 1296 (3d Dept. 2015) (evidence that property obtained during a marriage was a gift to only one spouse, if unrebutted, can satisfy the donee's burden to prove that it is separate property). Therefore, it is hereby:
ORDERED, that the Wife's thirty (30%) percent interest in and to XXXX be and the same is hereby declared and is classified as her sole and separate property.
APPRECIATION OF SEPARATE PROPERTY
Inasmuch as the Court has concluded that the Wife's interest in XXXX is her separate property, the Court now undertakes an analysis of whether or not the Husband has any claim in and to the appreciation of same. Under the equitable distribution statute, separate property is defined to include an increase in value of separate property, except to the extent that such appreciation is due in part to the contributions or efforts of the other spouse. Shvalb v. Rubinshtein, 204 AD3d 1059 (2d Dept. 2022). Thus, any appreciation in the value of separate property due to the contributions or efforts of the nontitled spouse will be considered marital property. Shvalb, 204 AD3d at 1061-1062.
Two seminal cases from the Court of Appeals articulated the law on, in sum and substance, separate property and the appreciation thereof: Price v. Price, infra, and Hartog v. Hartog v. Hartog, infra.
In Price v. Price, the Court of Appeals wrote, in part, that:
We hold, therefore, that where separate property of one spouse has appreciated during the marriage and before execution of a separation agreement or commencement of a matrimonial proceeding and where such appreciation was "due in part" to the contributions or efforts of the nontitled spouse as parent and homemaker, the amount of that appreciation should be added to the sum of marital property for equitable distribution. Whether assistance of a nontitled spouse, when indirect, can be said to have contributed "in part" to the appreciation of an asset depends primarily upon the nature of the asset and whether its appreciation was due in some measure to the time and efforts of the titled spouse...[a]s a general rule, however, where the appreciation is not due, in any part, to the efforts of the titled spouse but to the efforts of others or to unrelated factors...the appreciation remains separate property, and the nontitled spouse has no claim to a share of the appreciation.
The question under section 236(B)(1)(d)(3) as to indirect contributions of the nontitled spouse as parent and homemaker is whether there was an appreciation of separate property due to the efforts of the titled spouse during the period when it is shown that those efforts were being aided or facilitated in some way by these indirect contributions. If so, the amount of appreciation during that period is considered a product of the marital partnership over which the trial court "retains the flexibility and discretion to structure [a] distributive award equitably". The nature and measure of the services performed by the nontitled spouse as parent and homemaker and the degree to which they may have indirectly contributed to the appreciation of separate property, are matters to be weighed and decided by the trial court — not in making this initial determination under section 236 [*18](B)(1)(d)(3) — but in making its distribution of the appreciation as marital property under section 236(B)(5).
Price v. Price, 69 NY2d 8 (1986) (internal citations omitted).
Then, in Hartog v. Hartog, the Court of Appeals wrote:
In Price v Price,[FN51]this Court set forth the "active/passive" test, which established the guidelines for determining whether the appreciation in a titled spouse's separate property has been transmuted into marital property based on the indirect contributions of the nontitled spouse. Explicitly noting the Legislature's intent to have the term marital property broadly construed, and emphasizing the economic partnership theory of marriage, we held that the dispositive inquiry of "[w]hether [indirect] assistance of a nontitled spouse...can be said to have contributed 'in part' to the appreciation of an asset depends primarily upon the nature of the asset and whether its appreciation was due in some measure to the time and efforts of the titled spouse". Thus, in Price, we required that both the nature of the asset and the efforts of the titled spouse be considered in the inquiry. Price is silent, however, as to quantifying the threshold "causal link" necessary to trigger the classification of the appreciation of separate property, in whole or in part, as marital property.
While we articulated the need for some connection and left the calibration of that standard for another day, the inevitable implication of Price was rejection of the "all or nothing" approach that would be interposed by adopting a particularized causative nexus requirement. We were careful to note that the totality of the appreciation retained its separate property character only where the appreciation was "not due, in any part, to the efforts of the titled spouse," but, rather, was due in its entirety "to the efforts of others or to unrelated factors". That is not this case.
Elaborating on these principles and remaining true to statutory language and intent, we conclude that where an asset, like an ongoing business, is, by its very nature, nonpassive and sufficient facts exist from which the fact finder may conclude that the titled spouse engaged in active efforts with respect to that asset, even to a small degree, then the appreciation in that asset is, to a proportionate degree, marital property. By considering the extent and significance of the titled spouse's efforts in relation to the active efforts of others and any additional passive or active factors, the fact finder must then determine what percentage of the total appreciation constitutes marital property subject to equitable distribution.
Hartog v. Hartog, 85 NY2d 36, 48-49 (1995) (internal citations largely omitted [FN52]).
When a nontitled spouse's claim to appreciation in the other spouse's separate property is [*19]predicated solely on the nontitled spouse's indirect contributions, some nexus between the titled spouse's active efforts and the appreciation in the separate asset is required. Hartog v. Hartog, 85 NY2d 36 (1995). Some connection between the titled spouse's effort and the appreciation must be discernible from the evidence. Hartog, 85 NY2d at 46. As Judge Smith wrote in dissent in Fields v. Fields, "...[t]he statutory words "in part" refer to the possibility that the partnership of which the untitled spouse is "part" may contribute to the appreciation; "to the extent" that it does so, the resulting appreciation will be deemed marital, and the "part" of that marital appreciation due to the untitled spouse's efforts will be recognized when the marital property is divided..." and "...[w]hen dealing with the appreciation in separate property, the statute assigns two tasks to a court: first, to figure out the "extent" to which appreciation results from the "contributions or efforts" of the untitled spouse, either solely or as a member of the marital partnership, and to include the appreciation in marital property to that extent; and secondly, to decide what "part" of that marital property the untitled spouse should receive..." Fields v. Fields, 15 NY3d 158 (2010) (Smith, R.S., dissenting).[FN53]

As reiterated herein, but as argued by the Husband within the context of any claim to appreciation, the Court rejects the Husband's argument that the Wife's tax filings are, in effect, dispositive that the Wife undertook active involvement in XXXX. Indeed, while the parties' own tax returns from 2020 and (initially) the Wife's (nonamended) tax return from 2021 reflect nonpassive income, the Court cannot ignore that the parties' jointly filed income tax returns - which were all prepared by the Husband - from 2016, 2017, 2018 and 2019 reflected passive income from XXXX. In fact, the parties jointly represented on double the amount of tax returns - prepared by the Husband himself - that the income from XXXX was passive as opposed to nonpassive. It is for this reason that the Court declines to extend Mahoney-Buntzman to both of these parties (see supra). The saying comes to mind: what's good for the goose is good for the gander. Put a different way, while the Husband argues that the Wife, in effect, should be bound by her tax filings representing her income from XXXX as nonpassive in 2020 and 2021, the Court, with equal vigor, could have applied that concept to the Husband, who represented that the Wife's income from XXXX was passive in years 2016, 2017, 2018 and 2019. The Court therefore does not buy into the Husband's argument that the income from XXXX was nonpassive, thus making it subject to a claim of appreciation. The Court also vetoes the Husband's argument that he is a "layperson"; his status as a layperson does not excuse his representations and certifications to the taxing authorities.
The Husband has not persuaded the Court that the "board meetings" of XXXX demonstrate the Wife's "active" involvement in same, or that the O'Toole Family "zoom" meetings were "board meetings" at all. Initially speaking, the "O'Toole Family Call Log"[FN54]
reflects "O'Toole Family Call" approximately once per month from approximately midway through 2021 to approximately midway through 2024. That call log does not reflect XXXX in any of the calls. Mr. O credibly testified about the O'Toole Family "zoom" meetings, that the [*20]purpose was, in sum and substance, to get together as a family and to address tax information, how the stock market works, how inflation works and interest rates work, and that. XXXX was discussed at one of these "zoom" meetings. There was no evidence in this Record that the Wife was an "active" participant in these "zoom" meetings. There was also no evidence in the Record that the Wife would actively discuss the business of XXXX, give her input as to XXXX's operations or investments, or that she was making decisions regarding XXXX. Rather, the highly credible testimony during the Hearing was that Mr. O makes all of the decisions of XXXX without consultation with the other Members. The Husband did not prove to this Court any nexus between the Wife's attendance on these "zoom" calls and her involvement in XXXX which enhanced XXXX's value.
The Court has also reviewed the "XXXX Meeting Summary Emails",[FN55]
as well as the Wife's "notes" from the O'Toole Family "zoom" meetings.[FN56]
A few pages of that Exhibit are emails; a few pages of that Exhibit are emails with spreadsheets contained therein. As to the Wife's notes, the Court is unpersuaded that they reflect an active undertaken by the Wife with respect to XXXX. The mere fact that the Wife took notes - without other evidence [FN57]
- is insufficient to come to a conclusion that her role in XXXX was active. As to the emails, the Court reaches the same conclusion. The first two emails do not reflect who sent the contents thereof nor who received the contents thereof. The third email reflects that it was sent from A [FN58]
to the Wife. The fourth email reflects that Mr. O sent an email to the Wife, A.[FN59]
That email has no content, and simply has an unknown attachment. The fifth email is from Keri Gilbert [FN60]
sent to four (4) recipients, including the Wife, entitled "Get rich with Rich - week 2 & 3 notes", with content reading "Hi everyone, week 2 and 3 notes attached." These emails collectively do not demonstrate that the Wife was an active participant in XXXX. The Wife's mere receipt of emails with information and/or documentation from XXXX is insufficient to demonstrate that she has an active involvement in XXXX or that her involvement enhanced the value of XXXX. In fact, it would be logical to conclude that the Wife would receive emails concerning XXXX because she has a thirty (30%) percent interest in same. But receipt of emails concerning XXXX does not translate to a finding that her role in XXXX was active, that she enhanced the value of XXXX or that the Husband enhanced the value of XXXX.
The Court is not persuaded by the Husband's argument regarding the Wife's testimony that she and the other Members of XXXX are poised to run the "business" in Mr. O's absence. The fact remains that as of the Hearing, it is clear to the Court that Mr. O is running the [*21]"business" of XXXX without consultaiton, input, feedback or consent from the other Members. Such argument that the Wife is effectively poised to run XXXX in the future is tangential at best, and fails to draw any nexus as to how a future occurrence - which has yet to occur - has enhanced the value of XXXX.
The Husband's argument that he was home with the parties three young daughters effectively caring for them during the O Family meetings because the Wife, during that time, was effectively unable to provide child care falls flat. The Husband failed to demonstrate that him caring for three children once per month for a few hours at most enhanced the value of XXXX and/or helped the Wife enhance the value of XXXX. The Wife's mere attendance on "zoom" meetings", while the Husband preformed the duties of a spouse and father of watching the children, did not aid the Wife in actively enhancing the value of XXXX.
As stated before, the Husband was granted permission to file a Supplemental Memorandum. This was granted, in part, because the Husband claimed that new evidence was uncovered after the Hearing. The Court has carefully read his Supplemental Memorandum. The Court is unpersuaded and, in any event, finds that the new "evidence" does not change the Court's decision. It is initially undisputed that XXXX, through counsel, sent a letter to the Husband's matrimonial counsel with a draft complaint to be filed in the United States District Court of the Eastern District of New York (hereinafter referred to as the "Draft Federal Complaint"). The Draft Federal Complaint, inter alia, references the fact that XXXX may contain "corporate records" or "confidential corporate records".[FN61]
The Court, as a threshold matter, fails to see the connection between XXXX having corporate records and the Wife being gifted a thirty (30%) percent interest in and to XXXX. Even if XXXX has corporate records, such records do not diminish the fact that the Wife received her thirty (30%) percent interest in and to XXXX as a gift (see supra). Secondarily, even if XXXX maintains corporate records, the credible evidence adduced at the Hearing is that the Wife has no involvement in the day-to day operations, decisions and/or management of XXXX, and the record at the Hearing and the Husband's Supplemental Memorandum elides any cognizable proof, nexus or persuasive argument as to how maintaining corporate records is compatible with the Wife enhancing the value of XXXX and/or with the Husband tendering nonfinancial duties to help the Wife enhance the value of XXXX.
In conclusion, the Court does not find that the value of XXXX has appreciated due to the Wife's efforts (see generally Zaretsky v. Zaretsky, 66 AD3d 885 (2d Dept. 2009) (record reflects that no efforts on the plaintiff's part resulted in the appreciation of value of a certain property; defendant not entitled to any share of appreciated value)). Nor does the Court find that the Husband - the nontitled spouse - made any contributions, either direct or indirect, to appreciate the value of the Wife's thirty (30%) percent interest in and to XXXX (see generally Garcia v. Garcia, 200 AD3d 652 (2d Dept. 2021) (any appreciation in the value of separate property due to the contributions or efforts of the nontitled spouse will be considered marital property)).
On this Record, the Court does not find that sufficient facts exist from which the undersigned Justice could have concluded that the Wife engaged in active efforts with respect to her interest in XXXX, even to a small degree. See generally Hartog v. Hartog. In summary, the [*22]Record was entirely devoid of any evidence or testimony that the Wife enhanced the value of XXXX and/or that the Husband undertook conduct that aided the Wife in enhancing the value of XXXX. Therefore, for all of the aforesaid reasons, it is hereby:
ORDERED, that the Husband has no claim(s) of marital appreciation in and to the value of the Wife's thirty (30%) percent interest in and to XXXX.
Any other relief requested not specifically addressed herewith is hereby DENIED.
This constitutes the DECISION AND ORDER of this Court.
Dated: April 4, 2024
Mineola, New York
E N T E R:
Hon. Edmund M. Dane, J.S.C.

Footnotes

Footnote 1:Motion Sequence No.: 001.

Footnote 2:Motion Sequence No.: 003.

Footnote 3:For purposes of referencing the exhibits in evidence at the Hearing, the Wife will be referred to as the "Plaintiff" and the Husband will be referred to as the "Defendant".

Footnote 4:See Plaintiff's Exhibit "1", in evidence.

Footnote 5:See Plaintiff's Exhibit "2", in evidence.

Footnote 6:See Plaintiff's Exhibit "2", in evidence, section 2.1.

Footnote 7:See Plaintiff's Exhibit "11", in evidence.

Footnote 8:See Plaintiff's Exhibit "12", in evidence.

Footnote 9:See Defendant's Exhibit "Q", in evidence.

Footnote 10:See Plaintiff's Exhibit "32", in evidence.

Footnote 11:See Plaintiff's Exhibit "34", in evidence.

Footnote 12:See Plaintiff's Exhibit "33", in evidence.

Footnote 13:See Plaintiff's Exhibit "18", in evidence.

Footnote 14:See Plaintiff's Exhibit "20", in evidence.

Footnote 15:See Plaintiff's Exhibits "22" and "24", in evidence.

Footnote 16:See Plaintiff's Exhibit "31", in evidence.

Footnote 17:See Plaintiff's Exhibit "13", in evidence.

Footnote 18:See Plaintiff's Exhibit "14", in evidence.

Footnote 19:See Defendant's Exhibit "R", in evidence.

Footnote 20:See Defendant's Exhibit "N", in evidence.

Footnote 21:See Defendant's Exhibit "O", in evidence.

Footnote 22:See Defendant's Exhibit "F", in evidence.

Footnote 23:See Defendant's Exhibit "Q", in evidence.

Footnote 24:See Defendant's Exhibit "L", in evidence.

Footnote 25:See Plaintiff's Exhibit "10", in evidence.

Footnote 26:See Defendant's Exhibit "AE", in evidence.

Footnote 27:See Defendant's Exhibit "AD", in evidence.

Footnote 28:See Defendant's Exhibit "AC", in evidence.

Footnote 29:See Plaintiff's Exhibit "1", in evidence.

Footnote 30:See Plaintiff's Exhibit "6", in evidence.

Footnote 31:See Defendant's Exhibit "R", in evidence; specifically, Section (I)(c) thereof.

Footnote 32:See Plaintiff's Exhibit "1", in evidence.

Footnote 33:See Plaintiff's Exhibit "2", in evidence.

Footnote 34:See Plaintiff's Exhibit "2", in evidence, Section "2.1".

Footnote 35:See Plaintiff's Exhibit "12", in evidence, 2016 Schedule K-1.

Footnote 36:See Plaintiff's Exhibit "12", in evidence, 2017 Schedule K-1.

Footnote 37:See Plaintiff's Exhibit "12", in evidence, 2018 Schedule K-1.

Footnote 38:See Plaintiff's Exhibit "12", in evidence, 2019 Schedule K-1.

Footnote 39:See Plaintiff's Exhibit "12", in evidence, 2020 Schedule K-1.

Footnote 40:See Defendant's Exhibit "M", in evidence.

Footnote 41:See Defendant's Exhibit "N", in evidence.

Footnote 42:See Defendant's Exhibit "O", in evidence.

Footnote 43:See Defendant's Exhibit "R", in evidence.

Footnote 44:Had the Wife, for instance, affirmatively asserted that her interest in XXXX was "marital" or "marital property" on her sworn Statement of Net Worth, the Court may have reached a different result or given that statement more weight. But the Wife leaving that section "blank" is not a sufficient basis for this Court to foreclose the Wife from asserting her interest in and to XXXX was a gift. 

Footnote 45:See Section "2.3" of the Operating Agreement of XXXX.

Footnote 46:See Plaintiff's Exhibit "19", in evidence, page 12.

Footnote 47:See Plaintiff's Exhibit "21", in evidence, page 12.

Footnote 48:See Plaintiff's Exhibit "23", in evidence, page 13.

Footnote 49:See Plaintiff's Exhibit "24", in evidence.

Footnote 50:See Defendant's Exhibit "J", in evidence.

Footnote 51:69 NY2d 8 (1986).

Footnote 52:With the exception of Price v. Price, supra.

Footnote 53:As Judge Smith also wrote "...[a]s we held in Price, the "contributions or efforts" referred to in the statute may be of two kinds: those that directly enhance the value of an asset, or "indirect contributions" as homemaker and parent..." Fields, 15 NY3d at 172.

Footnote 54:See Plaintiff's Exhibit "13", in evidence.

Footnote 55:See Defendant's Exhibit "H", in evidence.

Footnote 56:See Defendant's Exhibit "F", in evidence.

Footnote 57:Such as, for example, proof that the Wife had input in the decision-making process of XXXX or that the Wife gave recommendations to the operations or management of XXXX.

Footnote 58:The Wife's brother.

Footnote 59:The Wife's sister.

Footnote 60:Apparently an employee of R.

Footnote 61:See Draft Federal Complaint ¶¶ 12, 17, 20, 21, 23, 24, 25, 26, 28, 30, 32, 39, and 41.