[965 NE2d 906, 942 NYS2d 404]

DAVID MIRVISH, Appellant, v HANNO D. MOTT, Individually and as Executor of YULLA H. LIPCHITZ, Deceased, et al., Respondents.

Argued January 3, 2012; decided February 16, 2012

### POINTS OF COUNSEL

*Carter Ledyard & Milburn LLP*, New York City (*Gary D. Sesser, Ronald D. Spencer, Susan B. Kalib* and *Judith M. Wallace* of counsel), for appellant. I. Yulla Lipchitz' gift of "The Cry" to Biond Fury was valid. (*Gruen v Gruen*, 68 NY2d 48; *Matter of Szabo*, 10 NY2d 94; *Matter of Van Alstyne*, 207 NY 298; *Beaver v Beaver*, 117 NY 421; *Sofsky v Rosenberg*, 76 NY2d 927; *Davin v Isman*, 228 NY 1; *Matter of Brown*, 252 NY 366; *Indig v Finkelstein*, 23 NY2d 728; *Cowee v Cornell*, 75 NY 91; *Anagnostou v Stifel*, 168 AD2d 256.) II. The Appellate Division failed to distinguish between the right of ownership and the remedy of conversion. (*Tanges v Heidelberg N. Am.*, 93 NY2d 48; *Solomon R. Guggenheim Found. v Lubell*, 77 NY2d 311; *Bakalar v Vavra*, 619 F3d 136.) III. The Appellate Division erred in holding that Mott's actions before 2004 constituted conversion. (*State of New York v Seventh Regiment Fund*, 98 NY2d 249; *Solomon R. Guggenheim Found. v Lubell*, 77 NY2d 311; *Vigilant Ins. Co. of Am. v Housing Auth. of City of El Paso, Tex.*, 87 NY2d 36; *Sporn v MCA Records*, 58 NY2d 482; *Pease v Smith*, 61 NY 477; *Stanley v Morgan Guar. Trust Co. of N.Y.*, 173 AD2d 390; *General Stencils v Chiappa*, 18 NY2d 125.)

*Rottenberg Lipman Rich, P.C.*, New York City (*Harry W.*

*Lipman* and *Robert A. Freilich* of counsel), for respondents. I. The Appellate Division correctly held that Mirvish's causes of action are time-barred. (*Sporn v MCA Records,* 58 NY2d 482; *Ely-Cruikshank Co. v Bank of Montreal,* 81 NY2d 399; *State of New York v Seventh Regiment Fund,* 98 NY2d 249; *Varga v Credit-Suisse,* 5 AD2d 289, 5 NY2d 865; *Guild v Hopkins,* 271 App Div 234, 297 NY 477; *Solomon R. Guggenheim Found. v Lubell,* 77 NY2d 311; *Brown v Garey,* 267 NY 167; *Boyce v Brockway,* 31 NY 490; *Laverty v Snethen,* 68 NY 522; *Employers' Fire Ins. Co. v Cotten,* 245 NY 102.) II. Mirvish's claims are time-barred because Fury failed to sue within three years of his alleged receipt of the gift instrument. (*Telaro v Telaro,* 25 NY2d 433; *New York City Tr. Auth. v New-York Historical Socy.,* 167 Misc 2d 31, 237 AD2d 419; *Elghanayan v Elghanayan,* 265 AD2d 262; *State of New York v Seventh Regiment Fund,* 98 NY2d 249; *Martin v Briggs,* 235 AD2d 192; *SongByrd, Inc. v Estate of Grossman,* 206 F3d 172, 531 US 824; *Herrington v Verrilli,* 151 F Supp 2d 449.) III. Mirvish cannot prove that Ms. Lipchitz completed a valid inter vivos gift of "The Cry." (*Gruen v Gruen,* 68 NY2d 48; *Matter of Abramowitz,* 38 AD2d 387, 32 NY2d 654; *Freeman v Johnston,* 84 NY2d 52, 513 US 1016; *Zuckerman v City of New York,* 49 NY2d 557; *Friends of Animals v Associated Fur Mfrs.,* 46 NY2d 1065; *Sofsky v Rosenberg,* 76 NY2d 927; *Merritt Hill Vineyards v Windy Hgts. Vineyard,* 61 NY2d 106; *Davin v Isman,* 228 NY 1; *Gaines v Huyler,* 113 Misc 188, 206 App Div 777, 239 NY 611; *Matter of Scherzinger,* 272 App Div 722.) IV. Dismissing Mirvish's claim to ownership on grounds of untimeliness or failure of delivery makes for good public policy.

### OPINION OF THE COURT

READ, J.

Jacques Lipchitz, the Russian-born cubist sculptor, died in 1973 at the age of 81. He was survived by his wife, Yulla H. Lipchitz, who inherited many valuable works of art from her husband, including "The Cry," a 1,100-pound bronze sculpture, cast three of seven, 1928-1929. After she was widowed, Yulla began a relationship with Biond Fury as early as 1980; the two of them lived together for 17 years prior to her death on July 20, 2003 at the age of 92.

From time to time, Yulla would make gifts to Fury, including art created by her late husband. She memorialized these gifts by giving Fury a picture of the artwork with a writing describing the piece and declaring that it was a gift. After Yulla's death,

Fury produced a photograph of "The Cry" with the following notation on the back, in Yulla's handwriting: "I gave this sculpture 'The Cry' to my good friend Biond Fury in appreciation for all he did for me during my long illness. With love and my warm wishes for a Happy Future, Yulla Lipchitz October 2, 1997, New York." At the time, "The Cry" was apparently in storage in New York in the custody of the Marlborough Gallery, Inc. (Marlborough), the Manhattan art dealer.[1]

About a year later, the French minister of culture and communication approached Pierre Levai, Marlborough's president, to ask about the possibility of placing "The Cry" on exhibit in Paris for a period of five years, "with a view to its ultimately being purchased." The minister proposed to include "The Cry" in a group of modern and contemporary works to be installed in the Tuileries Gardens near the Louvre Museum. On November 11, 1998, Levai wrote the minister that he had discussed the French government's request "with the Lipchitz family," who agreed to loan the sculpture for three years, unless Yulla died earlier. At the conclusion of the loan, Levai continued, the family was "prepared to negotiate a sale of the work," but if "[a]t the conclusion of the loan, . . . the sculpture [was] not purchased, it [was] to be returned to the Lipchitz family in New York at the borrower's cost."

Levai discussed the loan of "The Cry" to the French government only with Mott, never with Yulla. Mott, who at the time did not know about the handwritten gift instrument conveying "The Cry" to Fury, is the executor and a residuary beneficiary of one third of his mother's estate. He is an attorney, and he handled Yulla's financial affairs and held power of attorney from her for many years prior to her death. Mott also performed legal work for Marlborough, beginning as early as 1980.

According to Mott, he talked to his mother about the loan and, on her behalf, "consented that ['The Cry'] should be put on display in the [Tuileries Gardens] in Paris and it was and it

---

1. Marlborough's records show that "The Cry" was "picked up" from the Lipchitz studio in Hastings-on-Hudson on July 9, 1997 for transport to the Marlborough warehouse. Fury, on the other hand, testified that, to the best of his recollection, in the late 1990s "The Cry" was moved from the Lipchitz studio to the Michael Leonard warehouse in New York, which is where he believed it to be located at the time Yulla made the gift of it to him; and that sometime later Hanno Mott, Yulla's son from her first marriage, arranged for "The Cry" to be transported elsewhere. Although Fury did not know for sure, he "assume[d]" that "The Cry" was delivered to the Marlborough warehouse after it was removed from the Michael Leonard warehouse at Mott's direction.

had [Yulla's] name on the loan." The French government at some point also inquired if, once the exhibition was over, Yulla was willing to make a gift of "The Cry." Mott testified that Yulla told him "No, of course not, but if they want to buy it, they can buy it"—i.e., that "we would [give] . . . a right of first refusal." "The Cry" was in Paris, subject to this agreement, when Yulla died. Her will did not mention "The Cry" or any other specific work of art. Fury claims not to have known that the sculpture was loaned to the French government in 1998.

On March 9, 2004, Fury's attorney sent a letter to Mott's attorney demanding immediate delivery of "The Cry" to Fury; he enclosed a copy of the deed of gift. Fury's attorney sent a second letter on September 30, 2004, noting that there had been no response to "[the] March 9, 2004 demand to deliver '[T]he Cry' to Mr. Fury." Then on January 12, 2005, Fury's attorney wrote yet again, complaining that he had "not received any response to [his] repeated written demands for delivery of 'The Cry' which was indisputably gifted to Mr. Fury by Yulla Lipchitz"; renewing the demand; and warning that "[f]ailure to deliver [the sculpture would] require commencement of a proceeding under SCPA 2105." This provision authorizes a person with a claim to property or the proceeds thereof alleged to be in a fiduciary's possession or control to petition Surrogate's Court for an order requiring the fiduciary to show cause why he should not deliver the property or proceeds (see SCPA 2105 [1]). Upon return of process, the surrogate must "determine the respective interests of the parties in the property or the proceeds or value thereof and make a decree accordingly" (SCPA 2105 [3]).

Mott claims to have sold "The Cry" and three other sculptures in a package deal in July 2004 to Marlborough International Fine Art Establishment (Marlborough International) for $1 million. He testified that he did this because these four works had been on consignment for a very long time,[2] and the estate needed the cash; moreover, he "did not believe that there was

_____

2. The record is not clear as to whether "The Cry" was entrusted to Marlborough for sale as well as storage. Mott testified that in March 2004, when he first became aware of Fury's claim of ownership, "The Cry" "had been on consignment and was continuing on consignment" with Marlborough although "there was no written consignment agreement," simply "a receipt that the work was received on consignment." For his part, Levai first declared that "[t]o the best of [his] knowledge," Mott in 1997 asked him "to keep ['The Cry'] for him, to keep it with some other sculptures in order to help him in storage"; and that he "really [didn't] remember" if "The Cry" was consigned to Marlborough. He later testified that "to the best of [his] knowledge," there

any merit to [Fury's] claim." But in a letter to the French minister dated January 10, 2005, six months *after* the purported sale of "The Cry" to Marlborough International, Mott informed the minister that Yulla had passed away in 2003; noted that "the agreement for the loan also provided that at its conclusion the Lipchitz family would be prepared to negotiate a sale of the Sculpture"; and inquired "[o]n behalf of the family . . . whether the Ministry [had] any interest in acquiring the Sculpture at this time before arrangements are made for its return."

On September 15, 2005, Fury sold his interest in "The Cry" to David Mirvish, an art collector and gallery owner in Toronto, for $220,000. On October 4, 2005, Mirvish's attorney notified Mott of the sale, and demanded that he let Mirvish know where the sculpture was and "allow [him] to take possession of it within 10 days of [the] letter"; and "[p]ending resolution of this matter, . . . make no sale or other transfer of the sculpture nor remove it from its present location." In a letter dated October 14, 2005, the estate's attorney refused this demand, asserting that "the Estate was the true owner of ['The Cry'], which was never subject of a valid inter vivos gift from [Yulla] to Biond Fury"; on October 20, 2005, he additionally informed Mirvish's attorney that the sculpture "had been on consignment to a gallery for many years and was sold over a year ago."

By petition dated October 26, 2005, Mott, as the executor of Yulla's estate, brought an action against Fury, asking Surrogate's Court for a determination pursuant to SCPA 209 (4) that the estate "was the rightful owner of, and . . . legitimately sold and passed title of the Cry."[3] Section 209 (4) empowers Surrogate's Court "[t]o determine a decedent's interest in any property claimed to . . . be property available for distribution under [the] will . . . , and to determine the rights of any persons claiming an interest therein, as against the decedent, or as between themselves, and to construe any instruments made by [decedent] affecting such property."

was no consignment agreement for "The Cry"; that Marlborough customarily memorialized consignments in a writing; that "The Cry" was not, in fact, consigned to Marlborough; and that Marlborough was never "asked to attempt to sell" the sculpture apart from the discussions with the French government.

3. Ownership of "The Cry" was not the only bone of contention between Mott and Fury. The petition, among other things, also asked the surrogate to determine that the estate was the rightful owner of two other works of art that Fury claimed Yulla gave him as gifts. One of these was alleged to have subsequently been sold to Mirvish's art gallery, which was therefore named as a respondent.

Mirvish subsequently commenced this action in Surrogate's Court against Mott, individually and as executor of Yulla's estate, by petition dated July 31, 2006. He asserted various causes of action against Mott, the estate or both; specifically, he alleged conversion; sought to impose a constructive trust on proceeds from the sale of "The Cry" received by the estate; asked for an order pursuant to SCPA 2105 compelling delivery of the property or the proceeds from its sale; alleged replevin; and demanded an order pursuant to SCPA 2102[4] disclosing the sculpture's whereabouts. In September 2006, Mott filed an answer that raised a statute of limitations defense.

Upon Mirvish's application, Surrogate's Court issued an order dated September 12, 2007 directing Mott to hold in escrow the $1 million that he "received on his alleged sale of The Cry, pending resolution of the conflicting claims of ownership" (2007 NY Misc LEXIS 7111, *8 [Sur Ct, NY County 2007]). The surrogate noted "that on one hand [Mott] claim[ed] to have sold The Cry in 2004, while on the other hand he subsequently corresponded with the French government presenting himself as still having control over the statue" (id. at *3-4). She concluded that equitable relief was warranted in view of these "discrepancies in [Mott's] assertions regarding his control over, and ownership of[ ] The Cry, coupled with his obvious willingness to ignore claims which he on his own determined to be invalid without first seeking judicial determination" (id. at *5).

By letter dated September 19, 2007, Mirvish's attorney notified Surrogate's Court that his client had filed suit in Supreme Court in June 2007 against Marlborough and Marlborough International for "among other things, conversion relating to the July 2004 sale of The Cry by Hanno Mott, on behalf of the Estate, to Marlborough International, and the subsequent transfer of The Cry to Switzerland in 2006." He informed the surrogate that this lawsuit had been settled almost immediately, on August 23, 2007, and "[p]ursuant to the settlement, the July 2004 sale was rescinded and The Cry . . . returned to New York [where it was] being held in escrow pending [her] determination of the ownership issue."

Mott, as executor of Yulla's estate, joined the settlement agreement, thereby agreeing to be bound by paragraphs 4 and 6

---

4. SCPA 2102 authorizes a proceeding in Surrogate's Court to require a fiduciary "[t]o supply information concerning the assets or affairs of an estate relevant to the interest of the petitioner when the fiduciary has failed after request made upon him in writing therefor" (SCPA 2102 [1]).

through 16 inclusive (with one exception not relevant here).[5] Notably, paragraph 4.b of the agreement states that the escrow agent shall hold "The Cry" and a disclaimer of interest in the sculpture executed by Marlborough and Marlborough International "until such time as it receives (i) joint instruction from Mirvish and Hanno Mott . . . , or (ii) *a final non-appealable judgment of a New York State Court determining ownership of the Sculpture*, whereupon the Sculpture and disclaimer of interest shall be delivered pursuant to such joint instruction or judgment" (emphasis added). Paragraph 7 describes the Surrogate's Court proceeding as "litigation over title" to "The Cry."

Subsequent to the settlement, the parties skirmished by letter and motion practice over the release of the $1 million held in escrow. At a court conference on September 4, 2008 and by letter dated the same day, though, Mirvish's attorney confirmed to the surrogate that his client had "withdrawn his claims for conversion and replevin in order to simplify the issues before the Court," and, as a result, was "also withdrawing his objection to Mr. Mott's motion to vacate the temporary restraining order requiring [him] to keep $1 million in escrow and restraining him from selling *The Cry*." By September 2008, of course, "The Cry" had been returned from Switzerland to New York and was in the custody of the agreed-upon escrow agent. By order dated October 3, 2008, Surrogate's Court vacated its prior order directing Mott to escrow $1 million, pursuant to the parties' stipulation consenting to the release of these monies.

At the time the settlement agreement was reached in August 2007, Mott's motion and Mirvish's cross motion for summary judgment in this action, filed the previous June and July, respectively, were pending. Mott argued in his motion that Mirvish's claim was untimely, and he could not prove all elements of a gift. Mirvish countered Mott's motion and contended in his cross motion that Yulla made a valid gift of "The Cry" to Fury; Mott's refusal to turn over "The Cry" and the estate's sale of the sculpture in 2004 were acts of conversion; and Mirvish, as Fury's assignee, was the true owner of "The Cry."

By order dated December 30, 2008, Surrogate's Court granted Mirvish's cross motion and denied Mott's motion for summary judgment. The surrogate concluded that Yulla had made a valid

---

**5.** Indeed, the obligations of Mirvish, Marlborough and Marlborough International under the settlement agreement were contingent upon Mott's execution of the joinder by August 31, 2007.

inter vivos gift of "The Cry" to Fury. She observed that the wording of the deed of gift was "in the past tense, i.e., 'I gave this sculpture "The Cry" to my good friend Biond Fury,' " which was not only "indicative of an antecedent transfer," but also "clearly identifie[d] the intended object and [was] consistent with [Yulla's] long pattern of making gifts of similar items to her companion." Mott appealed.

The Appellate Division reversed the surrogate's decree; granted Mott's motion for summary judgment to the extent of declaring Mirvish's claims of ownership of "The Cry" and his claims for damages barred by the statute of limitations; and denied Mirvish's cross motion (75 AD3d 269 [1st Dept 2010]). The court observed that constructive delivery of a "monumental work of art such as *The Cry*" would be "appropriate"; however "Fury's testimony [was] the only evidence of the decedent's delivery of the gift instrument to him," and his testimony was "inadmissible under CPLR 4519 [the Dead Man's Statute] because Fury [was] the person from whom [Mirvish] derive[d] his interest" (*id.* at 272). As a result, the Appellate Division concluded that it was error for the surrogate to grant Mirvish's cross motion for summary judgment (*id.*). The court then granted Mott's motion for summary judgment "to the extent of declaring that [Mirvish's] claim of ownership of *The Cry* and his claims for damages [were] barred by the statute of limitations" because "The Cry" was converted no later than 1998 when loaned to the French government (*id.* at 276). We granted Mirvish leave to appeal, and now reverse (16 NY3d 705 [2011]).

The principles of law that control the outcome of this appeal are a good deal less complicated than the history of the dispute, as is the application of those principles to the facts. In *Gruen v Gruen* (68 NY2d 48 [1986]), we held that

> "[f]irst, to make a valid inter vivos gift there must exist the intent on the part of the donor to make a present transfer; delivery of the gift, either actual or constructive to the donee; and acceptance by the donee. Second, the proponent of a gift has the burden of proving each of these elements by clear and convincing evidence" (*id.* at 53 [citations omitted]).

Relatedly, mere possession of a gift after the donor's death creates a presumption of delivery to the donee during the donor's lifetime. In *Sofsky v Rosenberg* (76 NY2d 927 [1990]),

for example, we affirmed summary judgment in favor of the defendant grantee because his "possession of the deed create[d] a presumption that the deceased grantor had delivered the deed to him before her death" (*id.* at 930). The plaintiff, the grantor's spouse, speculated that the deed was placed, at some unspecified time, in either an office safety box or a safety-deposit box at a bank, and that the defendant grantee had clandestinely and fraudulently removed the deed from one of those locations either while the grantor was seriously ill, or after she died. We concluded that these "unsupported, conclusory allegations that the deed had not been delivered" were insufficient to overcome the presumption and raise a triable issue of fact (*id.* at 930).

Here, Yulla's intent to make a present transfer of "The Cry" was clear on the face of the gift instrument, as the surrogate concluded. There is no suggestion Yulla was coerced; there is no question about her capacity. Nor is there any dispute that Fury accepted the gift. Moreover, the Dead Man's Statute creates no impediment to reliance on the presumption of delivery created by Fury's possession of the gift instrument, which was specifically addressed to him, after Yulla's death. Put another way, Mott has not raised a triable issue of fact so as to overcome the presumption of delivery; Mirvish has established each of the elements of a valid inter vivos gift—intent, delivery and acceptance—by clear and convincing evidence. Both Mott, as executor of Yulla's estate, and Mirvish filed petitions asking the surrogate to resolve the conflicting claims of ownership of "The Cry," and she correctly ruled in Mirvish's favor.

Further, even assuming that the statute of limitations for Mirvish's conversion and replevin claims has lapsed, the estate cannot as a result secure possession of or title to the sculpture.[6] Mott, on behalf of the estate, acknowledged and agreed in the settlement agreement that Surrogate's Court would decide the ownership of "The Cry" *on the merits*; indeed, this is the relief he sought in his petition pursuant to SCPA 209 (4), where he asked the surrogate to determine that the estate "was the rightful owner of, and . . . legitimately sold and passed title of the Cry." And under the settlement agreement, the estate cannot secure possession of "The Cry" without a final judicial determination of ownership in its favor. But here, the surrogate rightly

---

6. In light of our disposition of this appeal, we need not and do not express any opinion as to whether Mirvish's conversion and replevin claims accrued no later than 1998, as Mott contends and the Appellate Division agreed, or in 2004, as Mirvish urges.

concluded that Yulla made a valid inter vivos gift of "The Cry" to Fury, who sold his interest in the sculpture to Mirvish. So if the escrow agent cannot deliver "The Cry" to Mirvish because of the expiration of the statute of limitations, even though Mirvish has been adjudicated the sculpture's true owner, "The Cry" would be condemned to languish in escrow in perpetuity. This is surely not what the parties intended when they entered into the settlement agreement, which called for the return of "The Cry" from Switzerland to New York, to be held in escrow awaiting delivery to the party—either the estate or Mirvish—finally adjudicated the sculpture's owner.

Accordingly, the order of the Appellate Division should be reversed, with costs, and the order of Surrogate's Court reinstated.

Chief Judge LIPPMAN and Judges CIPARICK, GRAFFEO, SMITH, PIGOTT and JONES concur.

Order reversed, etc.