| |
|---|
| **Matter of Ingberman** |
| 2025 NY Slip Op 31306(U) |
| April 11, 2025 |
| Surrogate's Court, New York County |
| Docket Number: File No. 2007-0879/B |
| Judge: Rita Mella |
| Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service. |
| This opinion is uncorrected and not selected for official publication. |



SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------------x
Proceeding to Settle the Account of Israel Ingberman
as Sole Surviving Executor of the Will of

DECISION AFTER TRIAL
File No.: 2007-0879/B

HELEN INGBERMAN,
                                                      Deceased.
-------------------------------------------------------------------------x
M E L L A, S.:

In this contested accounting by Israel Ingberman (Israel) as the sole surviving Executor

of the estate of Helen Ingberman (decedent), objections were filed by Francisco Colon, also

known as Papo Colo (Colo). Colo is the Administrator of the estate of decedent's post-deceased

daughter, Jeanette Ingberman (Jeanette). Resolution of Colo's primary objections requires the

court to determine: 1) whether Jeanette gifted to Israel her entire interest in four limited liability

companies (LLCs) owned by decedent's estate through a document by which she purportedly

assigned that interest to Israel, and 2) whether two letters dated September 18, 2008, effectively

transferred Jeanette's income interest in two LLCs to Israel. In April 2023, the court held a five-

day bench trial to determine these issues.

*Background*

Decedent died on September 3, 2006, leaving an estate valued at over $3 million. On

March 21, 2007, letters testamentary issued to her children, Israel and Jeanette. The will provides

for the equal distribution of decedent's residuary estate between the two children. Among other

assets, Israel and Jeanette inherited decedent's interest in four businesses: Iroquois Hotel, LLC, J

& J Hotel Company, LLC, New Syndicate, LLC, and Washington Jefferson Hotel, LLC

(collectively, the Business Entities). Jeanette died intestate on August 24, 2011. On October 21,

2011, Colo, Jeanette's husband and sole distributee, was appointed Administrator of her estate.

[* 1]

Israel, as sole surviving Executor of decedent's estate, commenced the instant accounting proceeding on October 10, 2012.

According to Schedule J of the account filed by Israel, Jeanette assigned to him her interest in the Business Entities on August 31, 2009, and

> "[o]n September 1, 2009, the Estate of Helen Ingberman distributed to Israel Ingberman its 7.5% non managing membership interest in Washington Jefferson Hotel, LLC, its 15% non managing membership interest in Iroquois Hotel, LLC, its 5% non managing membership interest in J&J Hotel Company, LLC, and its 18% non managing membership interest in New Syndicate, LLC" (Ex. J-1 at 48).

The undated document upon which Israel relies to support his assignment claim states:

> "The undersigned, JEANETTE INGBERMAN, hereby assigns to ISRAEL INGBERMAN my entire interest in WASHINGTON JEFFERSON HOTEL, L.L.C., IROQUIS [sic] HOTEL, L.L.C., J & J HOTEL COMPANY, L.L.C., and NEW SYNDICATE, L.L.C., all New York limited companies, whether my interest is owned directly by me or through my interest in the Estate of Helen Ingberman, as a beneficiary thereof as of August 31, 2009.
>
> IN CONSIDERATION of ten dollars ($10.00) and other good and valuable consideration" (Ex. P-1, hereinafter referred to as the Assignment Document).

Below and to the left of Jeanette's signature—which was not notarized or witnessed or acknowledged—appears the word, "Accepted," followed by a colon, and, beneath that, Israel's signature (Ex. P-1).

Colo filed initial objections to the account on May 29, 2014, amended objections on March 31, 2017, and second amended objections on April 10, 2018. During the trial, with Colo's consent and with the court's permission, Israel filed an affidavit on April 18, 2023, further amending Schedule J of the account to include the following language:

> "On September 18, 2008 Jeanette Ingberman and Israel Ingberman as Executors of the Estate of Helen Ingberman signed letters addressed to Washington Jefferson, LLC and Iroquois Hotel, LLC directing to 'Please make all future distributions from [Washington Jefferson, LLC and Iroquois Hotel, LLC] to which the Estate is entitled payable to Mr. Israel Ingberman … to the attention of Neil Zimberg, for deposit to [a specific account number].… These letters were sent to Washington Jefferson, LLC and Iroquois Hotel, LLC, and thereafter all distributions from Washington Jefferson, LLC and Iroquois Hotel,

2

LLC that otherwise would have been made to the Estate of Helen Ingberman were paid directly to Israel Ingberman."

In response to Israel's affidavit, Colo filed an affidavit amending his second amended objections on April 24, 2023. In total, Colo asserted 18 objections.[1]

*The Bench Trial*

A bench trial was conducted on April 18, 2023, April 19, 2023, April 20, 2023, April 21, 2023, and April 24, 2023.[2] By agreement of the parties, only the subset of Colo's 18 objections pertaining to the Assignment Document and the September 18, 2008 letters (namely, Nos. 7, 9, 10, 13, 16, and 18) were at issue during the trial. The court heard testimony from nine witnesses and admitted thirty-six exhibits into evidence.

*Israel's Witnesses*

Israel testified that Jeanette was his younger and only sibling, who died of leukemia after being diagnosed in late 2008 (I. 26:3-16). Their parents were Holocaust survivors who came to the U. S. from Poland and settled in Brooklyn (I. 27:4-10). The Ingbermans were a close-knit Orthodox Jewish family that observed the Sabbath and kept kosher (I. 27:12, 43:17-21). As Jeanette grew older, she continued to have Sabbath dinners with decedent and sometimes

---

[1] On February 14, 2018, Colo moved for partial summary judgment, seeking a determination that the "purported transfer" of Jeanette's interest in the Business Entities to Israel Ingberman failed as a gift inter vivos. More specifically, Colo argued that the delivery element of a gift was not established because the interest was still in the name of the estate and was never in Jeanette's name. The court granted the motion on January 8, 2020 (*see Matter of Ingberman*, 2020 NY Slip Op 30030[U] [Sur Ct, NY County 2020]). The First Department reversed (*see Matter of Ingberman v Colon*, 194 AD3d 410, 411 [1st Dept 2021]), concluding that triable issues of fact existed as to "whether Jeanette relinquished dominion and control over her interest in the estate." The court concurs with Israel's position that Colo's reliance on lack of compliance with EPTL 13-2.2 to argue that there was no transfer of Jeanette's interest to Israel is foreclosed by the Appellate Division's ruling. Similarly, to the extent that Israel is suggesting that delivery of an inter vivos gift was established solely because he possesses the Assignment Document (Pet. Post-Trial Mem. at 19, 21, 24; Reply Mem. at 9), this argument is at odds with the First Department decision that directed the bench trial.

[2] References to the transcripts dated April 18, 2023, April 19, 2023, April 20, 2023, April 21, 2023, and April 24, 2023 are preceded by Roman numerals I., II., III., IV., and V., respectively.

3

attended synagogue with her (I. 43:22-44:1). Israel knew that Jeanette and Colo co-founded and ran an art gallery called Exit Art together, but he did not learn that they were married until Jeanette was in hospice (I. 35:22-25, 46:11-47:2). Decedent did not know that Jeanette and Colo were married, Jeanette did not wear a wedding ring, and Colo did not attend any Ingberman family events (I. 45:25-46:1, 47:19-23).

Israel stated that he and Jeanette had an "excellent" and "very close relationship" (I. 36:10-11). As adults, they spoke frequently and saw each other at family events (I. 36:19-25). Israel would come to Exit Art to have coffee with Jeanette (I. 37:1-2), but never visited her at her home on Canal Street although she lived there for 28 years (I. 94:17-95:3). He denied that there came a time when Jeanette was forbidden to see his children (I. 95:25-96:9).

When Jeanette was hospitalized, Israel saw her almost daily and helped her deal with her doctors (I. 37:9-24). Israel did not know Jeanette's financial circumstances in 2009 after she was diagnosed with leukemia, nor did he ask her about them (I. 98:20-24, 129:11-15). Jeanette was upbeat about her diagnosis, and her "mental state was always very stable" (I. 38:7-12, II. 25:4). Both Israel and Jeanette believed that she would survive her illness (I. 38:13-18, 38:25-39:4). Jeanette made "all her own [medical] decisions" and decided on a bone marrow transplant, which failed in May 2011 (I. 39:5-10, 40:4-9). Jeanette filled out paperwork to be transferred to Sloan Kettering for further treatment (I. 40:19-22). However, the transfer did not occur, and Jeanette instead went into hospice at Mount Sinai, dying approximately one week later with Israel at her side (I. 40:23-41:2, 41:20-22, 42:17-18).

Even though Jeanette and Israel were co-Executors of decedent's estate, Israel "took the lead" with respect to its administration, and was the primary contact person for Richard Levine, the attorney handling the estate (I. 104:16-18, 105:6-10). Jeanette relied on Israel to "arrange tax

4

matters that might arise with [decedent's] estate" (I. 105:3-5). According to Israel, decedent owned interest in four LLCs at the time of her passing, and he acknowledged that her will stated that the LLCs "should be equally divided between [Jeanette and Israel]" (I. 30:4-14).

Israel testified that he and Jeanette signed the Assignment Document in August 2009, at a coffee shop on Madison Avenue near Mount Sinai Hospital, at which time Jeanette was a chemotherapy outpatient (I. 50:3-18, 129:18-130:6). No one else was present (I. 50:19-21). According to Israel, before signing the document, Jeanette told Israel that "she wanted to memorialize" the Ingberman family's understanding that Israel "would receive the assets of what [Jeanette and Israel's] father started and what [decedent] had" (I. 50:22-51:5).[3] Israel elaborated that the family's understanding was that "all this, that the monies after my father passed away that eventually this monies [sic] would remain in the Ingberman family and be given to me from day one," with day one being "[t]he moment [decedent] passed away" (I. 124:4-5, 124:9-13). In testimony that the court does not credit, Israel stated that he saw "no contradiction" between the family's understanding and the terms of decedent's will (I. 124:14-16).

Levine provided the Assignment Document language to Israel over the phone after Israel called Levine and told him what Jeanette wanted to do (I. 51:11-17, 52:9-11). At the time of signing, neither Israel nor Jeanette thought that Jeanettte was going to die, so there was no reason to believe that her interest in the Business Entities would not remain in the Ingberman family (I. 129:16-130:3). When asked why Jeanette would give away her LLC income under these circumstances, Israel said that she did so "because the money was mine" (I. 130:4-6; see also I. 123:23-124:3). Israel chose not to retain counsel to oversee the transfer of a multimillion-dollar gift, although he engaged attorneys for other purposes (I. 125:13-126:1; I. 126:11-24).

---

[3] There was no objection to this testimony. In fact, at the start of the trial, objectant waived the right to assert objections under CPLR 4519 (I. 4:17-20).

Once the Assignment Document was signed, Israel did not think that any further steps were needed to make the assignment effective, nor did he take any further steps (I. 52:2-8, 72:20-22, 131:4-7). Israel initially testified that while Jeanette was still alive, he told Levine, an unspecified "managing person" of the Business Entities, and "probably" Jeanette's accountant about the Assignment Document (I. 53:15-25). He also stated that he sent the Assignment Document to the Business Entities prior to Jeanette's death (I. 54:14-16). Israel subsequently testified that he in fact sent the Assignment Document only to Richard Levine during Jeanette's lifetime (I. 72:17-19). When Jeanette died, decedent's estate was still the titular owner of the Business Entities (I. 35:17-21).

When asked how money from the estate account was distributed, Israel stated, "I distributed it equally between my sister and myself" (I. 59:20-21), and further remarked that he deposited funds directly into Jeanette's bank account (I. 65:1-12, 70:19-72:4). This pattern of equal division did not change at any point while Jeanette was still alive; according to Israel, "[w]e just continued the same pattern that we were doing" (I. 73:19-74:2; II. 18:20-24, 20:6-9). Israel stated that although he never stopped making equal distributions, Jeanette returned "the dollar amounts to [Israel] and kept a portion to pay her taxes" (I. 74:8-11). In total, Jeanette returned $730,000 through checks made out to Israel from September 2008 to December 2010 (I. 76:5-19; Ex. P-15). Israel wrote out the checks and Jeanette signed them (I. 76:20-77:10).

Israel explained that the September 18, 2008 letters were drafted at the request of Gotham Bank because Israel was seeking a bank loan, and those letters made it easier for him to repay the loan (I. 57:5-8, 57:11-23, 113:3-15, 114:25-115:6). He acknowledged that the letters were "just an instruction by the executors as to where estate income should be deposited" (I. 115:10-15). The loan closed on or about September 19, 2008 (I. 120:7-10). Israel stated that he did not make

6

[* 6]

any changes to the estate distributions even after he started receiving money in his checking account from the two LLCs that were the subject of the September 18, 2008 letters (I. 77:18-78:1). During Israel's direct examination, the following exchange ensued:

Q. Why did you continue to make distributions equally to you and Jeanette after these entities—why did you continue to make distributions to yourself and Jeanette in a 50/50 ratio even after these entities began sending the money directly in to your bank account?

A. My sister asked me to.

Q. Did she ever explain to you why?

A. Didn't need an explanation, she just asked me to.

Q. Now, you testified earlier that after the assignment was signed you believed that all of the entities belonged to you, correct?

A. Correct.

Q. How did that, the signatures on that document impact the way you and Jeanette distributed assets from the estate after the date of the assignment?

A. It didn't.

Q. Why not?

A. Because she asked me to continue it the same way (I. 79:1-19).

Richard Levine, who provided legal representation to Israel, but not Jeanette, in Israel's capacity as Executor of decedent's estate, testified that Israel told him that Jeanette wanted to assign her interest in the Business Entities to Israel (II. 29:6-21, 36:15-20, 44:22-45:7, 75:18-76:2). He confirmed that he dictated to Israel by telephone the language used in the Assignment Document (II. 36:12-16, 76:3-12). Levine never discussed the document with Jeanette, and said that had he known that Jeanette was married, he might have done things differently (II. 37:20-22, 37:23-38:9, 76:16-18, 77:7-13). Levine "probably" saw a copy of the assignment agreement shortly after it was signed by Israel and Jeanette (II. 36:5-11, 79:7-18).

7

[* 7]

According to Levine, Jeanette did not receive K-1s (the forms that decedent's estate would use to report the income paid to Jeanette as an estate beneficiary in a tax year) from the year beginning after the assignment became effective (II. 39:23-40:11), but he acknowledged that a draft K-1 was created for Jeanette for the estate tax year ending August 31, 2010, "most likely by [his] paralegal," and subsequently marked "delete" by him (II. 82:12-85:15, 87:20-89:7; 91:1-17; Ex. O-8A). Levine also acknowledged that the final K-1 for the estate tax year ending August 31, 2010 (which showed all income distributions from decedent's estate going to Israel) and the estate tax returns for that tax year were not completed until after Jeanette's death (II. 82:15-83:12, 89:14-90:7; Ex. O-8A). In addition, he testified that he drafted and revised the September 18, 2008 letters without discussing them with Jeanette (II. 65:12-66:3, 67:16-20).

Judith Hirsch prepared tax returns for Jeanette and Colo for 15 years, and previously prepared decedent's tax returns (IV. 165:2-6, 165:19-166:4). She was not involved in the preparation of decedent's estate tax returns (IV. 169:10-19). Hirsch stated that Jeanette helped decedent with her finances (IV. 167:6-8, 167:17-22). Jeanette filed simple returns until 2007, when she began receiving K-1s from decedent's estate (IV. 167:23-168:9). According to Hirsch, Jeanette "didn't understand" the assets she inherited from decedent; she only knew that they existed (IV. 169:20-25, see also 168:10-15). Jeanette told Hirsch that the assets belonged to decedent's estate and were "divided up for whatever was in the Will," and never expressed any position on her ownership with respect to those assets (IV. 170:2-10).

Hirsch testified that in September or October of 2010, which is when Jeanette filed her 2009 tax returns, Jeanette told her that she would no longer be receiving K-1s, without stating why, and that they could go back to the simple tax returns (IV. 172:11-24, 206:5-10). Jeanette did not receive a K-1 after the filing of her 2009 tax returns (IV. 171:25-172:10). Hirsch testified

8

that Jeanette and Colo's 2010 tax returns were filed on time on "April 15th" (IV. 206:11-14). Jeanette and Colo's 2010 income was $100,019 (IV. 213:25-214:3). Hirsch struggled to explain why she advised Jeanette to make substantial estimated tax payments in 2011 to the U.S. Treasury and to New York State for the 2010 tax year (IV. 185:18-23, 190:14-192:10, 206:15-210:13).

*Colo's Witnesses*

Colo, who was born and raised in Puerto Rico, described himself as a poet, curator, painter, and designer (III. 5:4-10, 5:16-17). When asked how he supported himself, he responded, "I have Social Security and I sell pieces" (III. 5:20-22). Colo and Jeanette, who were "madly in love," married in 1991 (III. 8:7-12, 26:15-20). He testified that Jeanette was conflicted about her family's disapproval of her relationship with a non-Jewish man, and saw a therapist as a result (III. 25:14-26:12). Jeanette's family prohibited her from seeing her nieces because of the relationship, and she was affected by that ban (III. 28:21-29:20). Although Israel attended some Exit Art openings, he never came to Colo and Jeanette's home (III. 30:9-12, 36:22-24). Colo and Israel visited Jeanette daily when she was hospitalized, and Colo accompanied her to the hospital (III. 49:12-21, 49:24-50:2). Colo was deeply affected by Jeanette's illness, and stated that he was "in a trance" (III. 50:18-25). He and Israel were both present when Jeanette died (III. 54:23-55:2).

Colo and Jeanette purchased a 4.5 acre property in the El Yunque rainforest (the El Yunque project) located in Puerto Rico, funding the purchase through the sale of a David Hammons sculpture (III. 39:24-40:17). They hired an architect, and construction began while Jeanette was still alive (III. 40:20-41:21). Colo and Jeanette were "[h]appy and enthusiastic" about the project and talked about it all the time (III. 42:21-25). According to Colo, they planned

to continue funding the project through Jeanette's inheritance, and later through grants (III. 43:5-24). At the time of trial, the project was still in the construction phase (III. 45:6-15).

After Jeanette died, the Puerto Rico apartment that she and Colo owned went into foreclosure because Colo lacked sufficient funds (III. 37:15-38:14). Colo described himself as financially illiterate and said that Jeanette handled all finances (III. 72:11-15, 73:3-7). He inherited artwork from Jeanette appraised at $510,329 by Christie's auction house (III. 82:25-83:12; Ex. J-15 at 13; Ex. P-24).

Maria Anna Pani testified that in 2012 she prepared the accounting of decedent's estate that is the subject of this trial (III. 94:19-95:1). She received the material necessary to prepare the accounting from Levine, including a copy of the Assignment Document, and did not audit any of the data she received (III. 96:19-23, 98:17-19, 102:24-103:4). Pani stated that deposits from Washington Jefferson Hotel, LLC and Iroquois Hotel, LLC, reflected in the estate account between September 18, 2008 and August 2009, were inconsistent with the September 18, 2008 letters (III. 104:5-107:8, 108:8-13, 109:2-110:22). "Someone" told Pani how to handle those deposits, and her only contacts with respect to the accounting were Levine and Israel (III. 119:10-12, 120:4-11, 121:16-19). Based on the information she had been given, Pani treated in the accounting any income coming into the estate after August 31, 2009 as belonging to Israel (III. 127:10-128:19).

Naomie Kremer testified that she and Jeanette became friends during freshman year of high school, and remained very close through most of their lives (III. 136:18-21, 138:10-19). Colo and Jeanette, who had a "lifelong love affair," began living together around 1980 (III. 139:4-21, 144:19-24). The relationship would not be well-received within the conservative Jewish community, and Jeanette, who identified as Jewish, chose to hide the relationship from

10

decedent (III. 140:13-141:24). Jeanette and Israel were close, and Jeanette was heartbroken when Israel forbade her from seeing his children (III. 142:13-143:12). Naomie stated that although Colo and Jeanette used proceeds from the sale of a David Hammons work to begin the El Yunque project, she did not know how they intended to fund the project going forward (III. 146:6-7, 146:15-24). She deemed it unlikely that Jeanette would turn her inheritance over to Israel (III. 151:23-152:13). While Naomie did not speak to Jeanette about financial matters, Naomie was aware that Jeanette was "always under financial pressure" (III. 155:22-156:8).

Jodi Hanel-Fernandez[4] worked at Exit Art with Jeanette and Colo from 1996 to 2007 (II. 111:19-112:3). She was very close to Jeanette and Colo (II. 112:7-17), and testified that Jeanette and Colo had "an incredible love" (V. 12:18-20). Hanel-Fernandez stated that while Jeanette celebrated high holidays, she did not attend temple regularly, which Hanel-Fernandez knew "[b]ecause [Hanel-Fernandez and Jeanette] were working together on Fridays and Saturdays" (II. 125:15-21; V. 21:8-17). She saw Israel's son at Exit Art "a couple times a year" between 1996 and 2007 (II. 137:18-138:5).

Jeanette handled finances at Exit Art and was "[a]lways hustling for money" from foundations and government agencies (V. 12:14-15, 12:25-13:11). Colo and Jeanette intended for the El Yunque project to be an artists' retreat, and that project "was something that Jeanette had intended to do forever" (V. 14:20-24, 20:4-8). Hanel-Fernandez stated that even in January 2011, Jeanette was "feeling very optimistic" regarding her illness and was excited about the El Yunque project (V. 22:13-23:2). Israel was helping Jeanette deal with her doctors, and Jeanette was grateful for his help (V. 28:24-29:6).

---

[4] Jodi Hanel-Fernandez was called as a witness by both Israel and Colo.

Hanel-Fernandez did not know the value of decedent's estate or how much Jeanette inherited, and she was aware that Jeanette owned valuable artwork (V. 27:11-19). However, because of Jeanette's constant fundraising for Exit Art and other projects, Hanel-Fernandez found it unimaginable that Jeanette would hand over her inheritance as "she needed the money" (V. 26:7-12). Although Hanel-Fernandez testified during her 2007 deposition that she saw a handwritten document in which Jeanette signed her inheritance over to Israel, she credibly explained that she had been mistaken (II. 128:22-130:2, 136:13-21, 138:21-140:1).

Melissa Rachleff Burtt previously worked at Exit Art in various capacities, including assistant curator, and reported to Jeanette (V. 31:19-33:2). Jeanette and Burtt were close, and Burtt listed Jeanette as her emergency contact until Jeanette's death (V. 33:22-34:5, 35:10-15). Burtt stated that she had "never seen a relationship" like Jeanette and Colo's, who "were together 24, 7" (V. 35:3-9).

When asked to characterize Jeanette's Judaism, Burtt replied, "Jeanette wasn't practicing. She was not reformed" (V. 36:10-12). Although Jeanette attended services on high holy days, she did not observe the Sabbath and worked at Exit Art "every Saturday" (V. 36:12-15, 36:23-37:2). In addition, Jeanette did not keep kosher (V. 37:3-4).

When Burtt called Jeanette to discuss Jeanette's leukemia, Jeanette "sounded very positive" (V. 37:14-17). The diagnosis hit Colo "like a ton of bricks" (V. 38:2-3), and Israel acted as Jeanette's "health advocate" (V. 49:9-11). Burtt visited Jeanette in 2011 when Jeanette was very sick, and Jeanette began talking about the El Yunque project and showed Burtt pictures on her computer of structures in a tropical forest (V. 38:9-39:20, 40:6-41:9). Jeanette told Burtt that the El Yunque project was "keeping her alive" (V. 42:5-14). Burtt realized based on the photos that the El Yunque project "costs a fortune," and said as much to Jeanette (V. 42:14-19).

12

Jeanette told Burtt that she was spending her inheritance on the project (V. 42:19-22). The structures in the photos on Jeanette's computer were paid for through the sale of a David Hammons sculpture (V. 46:9-13). When Burtt learned from the attorney handling Jeanette's estate that Jeanette had given away a portion of her inheritance, Burtt "screamed" (V. 43:6-25). She did not know the value of decedent's estate and did not discuss personal finances with Jeanette (V. 47:8-16).

Certified public accountant Charles Kremer is the husband of Naomie Kremer (V. 52:14-18). He has known Jeanette since 1975 and Colo since 1980 (V. 53:16-18, 54:11-13). Charles described Colo as "the big love of [Jeanette's] life" and stated that Jeanette and Colo were inseparable (V. 54:14-17, 55:6-11). According to Charles, Colo was "devastated" by Jeanette's illness (V. 67:25-68:1).

Charles became an Exit Art board member in the mid-1980s at Jeanette's request, and served as board chair for 15 years (V. 56:12-21, 57:20-58:1). Jeanette was responsible for the financial side of Exit Art, while Colo played no financial role (V. 58:22-59:3, 59:18-19). Exit Art faced financial challenges and closed in 2012 following Jeanette's death (V. 58:1-15). Charles met Israel multiple times at Exit Art (V. 64:5-8). Jeanette wanted Israel to be as involved as possible with Exit Art and seemed happy when he was present (V. 64:24-65:1). She was "very close" to Israel and his children, and it was very painful for her when she was not allowed to see the children once Israel and his wife learned that she was seeing Colo (V. 64:14-24).

According to Charles, when Jeanette was diagnosed with leukemia, it impacted her ability to work at Exit Art, but Jeanette was managing and everyone expected her to get through it (V. 67:8-22). Israel visited Jeanette daily in the hospital, and Jeanette was grateful to Israel for acting as her health advocate (V. 80:11-16).

[* 13]

Charles stated that in 2010, the Exit Art board went to Puerto Rico to determine whether Exit Art could take over the El Yunque project, because Jeanette and Colo could not afford to keep the project going themselves (V. 69:6-17). Jeanette and Colo accompanied the board members, and Jeanette was in good health (V. 69:18-23). Construction had largely been completed at that point (V. 70:8-10).

Charles testified that Jeanette was anxious and frustrated about her finances because "she had a lot of trouble with living on her salary," and she was looking forward to receiving her inheritance (V. 60:19-23, 61:5-9, 62:9-12). He added, "I know that Jeanette was not receiving the inheritance she expected because all or almost all of the available cash coming out of the estate to her was going to pay taxes. But she expected that to change in the future" (V. 63:12-15).

Jeanette had asked Charles "to help Colo take care of his affairs" if something happened to her (V. 71:13-20), and Charles had "fully expected" Colo to inherit whatever Jeanette's interest was in decedent's estate (V. 72:7-13). When Charles saw the Assignment Document, it "made no sense" to him and he "thought it was a forgery" (V. 74:7, 74:12-17). Charles could not "understand how it could be that this document was signed by Jeanette giving away her entire interest in the estate to Israel" (V. 74:12-15). After the Assignment Document was deemed not to be a forgery, he felt mystified, as "it was inconceivable to [him] that Jeanette who was fully expecting to live on this money and was complaining to [him] about the fact that it wasn't coming through fast enough would have given it away" (V. 74:18-23). When asked if Jeanette discussed her personal finances with him, he replied, "Anything of substance, yes" (V. 75:21-23). He was not aware that Jeanette told her accountant that she would no longer receive K-1s (V. 79:14-17).

14

Colo's counsel read into the record Israel's responses to Colo's notice to admit (Ex. O-20; Ex. O-21; I. 84:25-92:3). Israel made the following admissions, among others: 1) Jeanette was in and out of the hospital in July and August 2009, 2) Between her diagnosis and death, Jeanette was hospitalized on at least 15 to 20 occasions, 3) The Assignment Document was signed at Mount Sinai Hospital either in the lobby or in the coffee shop located in the hospital lobby, and 4) Israel as co-executor made virtually equal distributions from decedent's estate to himself and to Jeanette until the time of Jeanette's death.

*Discussion*

The Court of Appeals has stated that "[a]n inter vivos gift requires that the donor intend to make an irrevocable present transfer of ownership" (*Gruen v Gruen*, 68 NY2d 48, 53 [1986]). Additional elements of a valid inter vivos gift include "delivery of the gift, either actual or constructive to the donee" and "acceptance by the donee" (*Mirvish v Mott*, 18 NY3d 510, 518 [2012] [internal quotation marks omitted] [quoting *Gruen*, 68 NY2d at 53]; *see Matter of Szabo*, 10 NY2d 94, 98 [1961]). Delivery to the donee must be "sufficient to divest the donor of dominion and control over the property" (*Matter of Baum*, 66 AD3d 412, 413 [1st Dept 2009]; *see Matter of Szabo*, 10 NY2d at 98). The burden of proof is on the party claiming the gift, by clear and convincing evidence (*see Matter of Baum*, 66 AD3d at 413).

Issue 1: Whether Jeanette gifted her entire interest in the Business Entities to Israel through the Assignment Document

In an effort to meet his burden to prove the gift, Israel offered the following: 1) His own testimony regarding his "understanding" and that of everyone in his family that all of the assets were to be given to him; 2) The undated and unacknowledged Assignment Document; 3) The testimony of Hirsch, Jeanette's accountant, that after the alleged assignment, Jeanette told her that she would not be getting any more K-1s from decedent's estate; and 4) His own testimony

15

concerning his and Jeanette's agreement that, after the alleged assignment, Israel would continue to make equal distributions to Jeanette and to himself but Jeanette would return the money to Israel after retaining some amounts that, according to Israel, Jeanette would use to pay income taxes.

To be sure, the Assignment Document constitutes evidence of a gift and in particular of donative intent (*see Anagnostou v Stifel*, 168 AD2d 256 [1st Dept 1990] [finding that "[t]he documents executed by decedent arguably express his donative intent and purpose," although whether delivery had been proven remained an open question]). In addition, Hirsch's testimony regarding Jeanette's K-1s, if credited, would support Israel's position. However, the totality of the proof adduced at trial does not establish clear and convincing evidence of a valid inter vivos gift.

As an initial matter, to a large extent, Israel's testimony was simply not believable. Israel testified movingly about his relationship with Jeanette and the support he provided during her illness, and the court credits that testimony. However, other sworn statements made by Israel were often flatly contradicted or cast in doubt by incontrovertible documentary evidence, the testimony of disinterested witnesses that the court deemed highly credible (namely, Charles Kremer, Naomie Kremer, Burtt, and Hanel-Fernandez), and/or Israel's own words. For instance, Israel's self-serving and uncorroborated claim that it was understood by his family members that he was the sole owner of the interest in the Business Entities from the date of decedent's death is entirely at odds with the terms of decedent's will, which split ownership equally between Israel and Jeanette and which he, as one of the will's Executors, was bound to carry out. His claim is also inconsistent with Charles's testimony that Jeanette was looking forward to receiving her inheritance, as well as the credible testimony of Colo and Burtt that Jeanette intended to spend

16

her inheritance on the El Yunque project.[5] Although Israel characterizes Colo's witnesses as people "on the periphery of [Jeanette's] life" (Reply Mem. at 2), this assertion is clearly belied by the record, which reflects that all of these individuals had close, longstanding relationships with Jeanette.

Hirsch's testimony is similarly problematic. Her testimony regarding Colo and Jeanette's 2010 tax returns is entirely inconsistent with the tax returns themselves. Although Hirsch claimed that Jeanette and Colo's 2010 tax returns—reflecting no distributions from decedent's estate or from the Business Entities—were timely filed, line 68 on the federal tax returns and line 75 on the New York State tax returns reflect that filing extensions had been obtained (Ex. P-20). Importantly, not only were the 2010 tax returns filed after April 15, 2011, but they were filed after Jeanette's August 24, 2011 death, as evidenced by the fact that Colo filed the federal tax return as "surviving spouse" and a line above "Form 1040 U.S. Individual Income Tax Return 2010" (the first page of the federal tax return) says "DECEASED JEANETTE INGBERMAN 08/24/2011" (Ex. P-20 at 1; Ex. P-20 at "Sign Here" section of form 1040 [federal tax returns]). Similarly, the first page of form IT-201 (the New York State tax return) clearly indicates that Jeanette was deceased and states her date of death, and Colo filed as "surviving spouse" under "Taxpayer(s) must sign here" (Ex. P-20). In light of Hirsch's failure to testify accurately as to Jeanette's tax filing history, the court does not credit her testimony regarding Jeanette's statement with respect to the K-1s.

---

[5] Moreover, Israel's pronouncement (without citing to a single transcript or exhibit) that notwithstanding the purported assignment, Jeanette left Israel "financially secure" (Reply Mem. at 6), is at best disingenuous. Tax records reflect that Colo inherited primarily illiquid assets from Jeanette, and Israel has not contradicted Colo's testimony that a Puerto Rico condo was foreclosed on due to lack of funds to pay its carrying costs.

17

In addition, Hirsch was unable to provide a credible explanation for her advice to Jeanette to make significant estimated tax payments in 2011, in anticipation of taxes due for 2010. If Jeanette was no longer receiving distributions from decedent's estate, there would have been no need to make such advance payments. In any event, Hirsch also testified that Jeanette did not understand the assets she inherited from decedent and that Jeanette never expressed any position with respect to her ownership of the assets.

With respect to the assignment issue, the court next turns to the delivery and acceptance requirements that must be satisfied before an inter vivos gift can be deemed to have been effected. For the reasons discussed below, neither Israel's conduct nor Jeanette's conduct after the execution of the Assignment Document constitute clear and convincing evidence of either Jeanette's relinquishment of dominion and control over her interest in the Business Entities or Israel's acceptance of same, notwithstanding the presumption that a gift of value to a donee is accepted (*see Gruen*, 68 NY2d at 57).

First, as to delivery, Israel testified that notwithstanding the existence of the Assignment Document, Jeanette requested that he continue to make distributions from decedent's estate to her. Moreover, Israel admits that he continued to make distributions in equal shares at Jeanette's request long after the alleged assignment. This behavior is plainly inconsistent with Jeanette's relinquishment of dominion and control over her interest in these assets. The Surrogate of Cattaraugus County was faced with an analogous situation in *Matter of Hicks* (82 Misc 2d 326 [Sur Ct, Cattaraugus County 1975]), a case cited by Colo. In *Hicks*, the court found that no gift of stock certificates was made where, with the donee's knowledge, "the alleged donor continued to collect the dividends and use them for his benefit," and "the alleged donee actually made

18

deposits of the dividend checks in bank accounts to the credit of the alleged donor" (*id.* at 331).

Israel does not attempt to distinguish this case in his post-trial memorandum.[6]

Second, Israel made no effort to transfer title of the interest in the Business Entities from decedent's estate into his own name, even though he was aware of the need to transfer decedent's interest in the Business Entities from decedent to decedent's estate following decedent's death. While Israel's failure to act in this regard is not dispositive (*see, e.g., Shybunko v Geodesic Homes, Inc.*, 65 AD3d 581, 584 [2d Dept 2009] [stating that depending on the circumstances, "a valid inter vivos gift of stock was not precluded by the absence of a transfer of record on the corporate books" and finding that an issue of fact existed as to donative intent and whether there was an actual transfer of ownership]), the result is that he presented no clear and convincing evidence in support of his contention that Jeanette relinquished dominion and control over her share of decedent's estate related to the Business Entities to the point of no return.[7]

Third, to the extent that Israel is arguing that Jeanette's return of monies to him after he made distributions to her constitutes evidence of her relinquishment of dominion and control of her interest in the Business Entities, Israel failed to provide a credible explanation for Jeanette's actions. The arrangement Israel described is convoluted and nonsensical. He failed to explain why Jeanette, who declared income from the Business Entities on her 2009 tax returns, would want to claim on her tax returns—and pay taxes on—assets that did not belong to her. Israel

---

[6] The court is aware that limited liability companies (such as the Business Entities at issue here) do not issue stock certificates. However, as Israel himself asserted in his post-trial memorandum that "Jeanette's interest in the Business Entities is similar to interests in corporate entities" and proceeded to cite cases concerning the transfer of stock certificates (Israel's Post-Trial Mem. at 24), he cannot be heard to complain that the *Hicks* analogy is imperfect.

[7] Israel insists that he relied on Levine's advice in deciding not to effectuate recorded transfers, and that he cannot be held accountable for the consequences of doing so. However, as Colo correctly observes, the fact that Israel may have relied on counsel is irrelevant to the issues of Jeanette's donative intent or whether she relinquished dominion and control.

observes that there is no indication that Jeanette paid any income tax on funds that she received from Israel personally or through the estate after the Assignment Document was executed. However, no K-1s relevant to the post-execution date were prepared or issued to either Jeanette *or* Israel until after Jeanette passed away, at which point Jeanette had no control over the way prior distributions were characterized for tax purposes. Similarly, the relevant estate tax returns and Jeanette's personal income tax returns were not prepared until after her death. Furthermore, Israel's testimony that Jeanette signed checks returning funds to him based on her tax obligations cannot be taken at face value since Israel, who prepared those checks, candidly admitted— twice—that he had no knowledge of Jeanette's financial circumstances.

The evidence just discussed also defeats the element of acceptance. The presumption of acceptance on the part of a donee when the gift is of value "must yield to opposing evidence" (*Juliano v Juliano*, 145 AD3d 983, 985 [2d Dept 2016]). Here, Israel continued to make distributions to Jeanette of income from the Business Entities after the execution of the Assignment Document and thus cannot claim that he accepted the purported gift (*see id.* at 984-985 [finding that a purported inter vivos gift of property was not accepted where the alleged donee did not record the deed for several years]). Moreover, as noted previously, Israel did not transfer the title of the interest in the Business Entities to his name, an easy task that would have established his clear acceptance of the purported gift.

Israel's position with respect to acceptance is further weakened by the lack of credible evidence that he told anyone other than Levine about the Assignment Document at any time prior to Jeanette's death. In addition, Levine's testimony that he was advised in September 2009 that the Assignment Document had been signed is equivocal (*cf. Gruen*, 68 NY2d at 57-58 [emphasis added] [finding that acceptance was established where plaintiff presented evidence

20

"that he had made several *contemporaneous* statements acknowledging the gift to his friends and associates, even showing some of them his father's gift letter"]).

In sum, on the first issue, the evidence at trial did not establish that Jeanette gifted to Israel her interest in the Business Entities that she had received from decedent's estate. Israel failed to provide clear and convincing evidence of either delivery or acceptance in light of Jeanette's and his conduct contradicting the effect of the document.

Issue 2: Whether Jeanette gifted her individual income interest in Washington Jefferson Hotel, LLC and Iroquois Hotel, LLC to Israel

The court turns to the second issue requiring determination after trial, *i.e.*, whether the September 18, 2008 letters effectively transferred Jeanette's individual income interest in Washington Jefferson Hotel, LLC and Iroquois Hotel, LLC to Israel. The evidence established that the letters were executed by Israel and Jeanette in their fiduciary capacities, without Jeanette's input, for the purpose of improving Israel's loan prospects, and they only direct the deposit or payment of income to Israel's bank account (*see Matter of Jelnek*, 3 Misc 3d 725, 728 [Sur Ct, Queens County 2004] [concluding that no gift was made where decedent set up direct deposit of his salary and commissions into a specific checking account, but "retained the right to change the direct deposit scheme during his lifetime"]). In no way do they indicate a gift by Jeanette in her personal capacity.

Accordingly, on the second issue, with respect to the September 18, 2008 letters, Israel has failed to satisfy any element necessary to establish an inter vivos gift.

*Conclusion*

Based on the foregoing, the court finds that no valid inter vivos gifts relating to the Business Entities were made by Jeanette, and that Colo's objections numbered Nos. 7, 9, 10, 13, 16, and 18 are therefore sustained. The parties will be contacted for a conference to discuss the

21

balance of Colo's objections. Once those objections are determined, the court will direct Israel to amend his account consistent with the court's determinations.

Dated: April 11, 2025

_____
SURROGATE

To:

Thomas A. Brown, Esq.
tbrown@msbllp.com

Mary D. Dornan, Esq.
Mddorman@gmail.com

Lionel Etra, Esq.
letra@rhtax.com

Jayne M. Kurzman, Esq.
jmkurzman@davidsondawson.com

Barbara L. MacGrady
blmacgrady@davidsondawson.com

[* 22]